# IN THE SUPREME COURT OF IOWA

No. 17–1453

Filed May 24, 2019

**STATE OF IOWA,**

Appellee,

vs.

**PETER LEROY VEAL,**

Appellant.

---

Appeal from the Iowa District Court for Cerro Gordo County, Rustin T. Davenport Judge.

The defendant appeals his convictions for first-degree murder and attempted murder, challenging the jury pool and raising several other claims of error. **AFFIRMED ON CONDITION AND REMANDED WITH DIRECTIONS.**

Dylan J. Thomas, Mason City, for appellant.

Thomas J. Miller, Attorney General, Louis S. Sloven and Scott D. Brown, Assistant Attorneys General, and Carlyle T. Dalen, County Attorney, for appellee.

Russell E. Lovell, II, Des Moines, and David S. Walker, Windsor Heights, for amicus curiae NAACP.

**MANSFIELD, Justice.**

### I. Introduction.

This double homicide case presents important questions concerning a defendant's right to an impartial jury drawn from a fair cross section of the community, as well as a number of other trial-related issues. The defendant, an African-American, was charged with committing two murders in Cerro Gordo County and attempting to commit a third. Because of pretrial publicity he asked for a change of venue, and the trial was moved to Webster County. Although the Webster County jury venire contained five African-Americans, no African-American was seated on the jury that actually heard the defendant's case. The State exercised a peremptory strike on the last remaining African-American on the panel because the State's lead prosecutor in this case had also prosecuted her father successfully for murder. Following a jury trial, the defendant was convicted.

On appeal, we affirm the district court's ruling that there was no *Batson* violation in the striking of the juror.[1] We also reject the defendant's claims of a speedy trial violation, prosecutorial error, evidentiary error, lack of competence to stand trial, and insufficient evidence to sustain his convictions. However, we believe further consideration of the defendant's fair-cross-section claim is warranted in light of the decision we are filing today in *State v. Lilly*, ___ N.W.2d ___ (Iowa 2019). Therefore, we conditionally affirm while remanding for further proceedings consistent with *Lilly* and this opinion.

---

[1]*See Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986).

## II. Background Facts and Proceedings.

At about 2:00 a.m. on November 17, 2016, Mason City police officer Jennifer Barr was on patrol when she received a call from the dispatcher. An individual named Ron Willis, calling from outside Caleb Christensen's house, reported that Peter Veal had shot Willis's cousin and hit Willis on the head with a pistol. While en route to the location identified by the dispatcher, Officer Barr saw Veal walking in her direction. Veal was wearing a "light green coat," jeans, and a hat. Veal stopped when Officer Barr began to pull her patrol vehicle over. As soon as Officer Barr directed her spotlight toward Veal and made eye contact with him, he took off running. Officer Barr tried to pursue Veal but was unable to locate him.

When Veal was subsequently apprehended, he was shirtless and hatless, and it was apparent that his hands and jeans were very bloody. Veal also had mist drops of blood on his face. Veal had a cut on his hand, which he claimed to have received from jumping a fence, although the cut was on the top—not the bottom—of his hand.

Meanwhile, at Christensen's house, two people were dead. Melinda Kavars, Willis's cousin, was dead from a single gunshot wound. Christensen had been stabbed to death as a result of multiple knife wounds. The semiautomatic handgun used to kill Kavars was found at the scene with a jammed cartridge inside.

The police spotted Willis outside Christensen's house. He was shaking, sobbing, and crying. He informed police that Veal had shot Kavars and had tried to shoot him but the gun had malfunctioned. Willis explained that he had run out of the house. He expressed concern for the fate of Christensen. Willis had a cut on the top of his head where he said Veal had struck him with the gun.

There was a bloody trail beginning in the house that continued all the way to the location where Veal was apprehended. Along the trail, police found several items discarded by Veal—a hat, a cellphone, a green jacket, a shirt, and a folding knife.

A footprint analysis confirmed that the bloody footprints in the house matched the shoes Veal had been wearing. There was no trace or trail of blood out the door where Willis had exited.

DNA analysis confirmed the presence of Christensen's blood on Veal's discarded knife and shirt. Christensen's blood was also found on the jeans and shoes Veal was still wearing when apprehended. Veal's shirt, jeans, and shoes also contained evidence of his own blood.

An analysis of the gun determined that Willis's skin tissue was on the back of the slide. This was consistent with Willis's claim that Veal had struck Willis with the gun after it jammed when Veal tried to shoot Willis. The gun also had DNA from an unknown contributor on the textured portion of the pistol grip, but the sample was too weak to determine the source of the DNA.

Willis knew both Veal and Christensen. Willis later testified that on November 16, at around 7:00 p.m., Willis received a call from Veal, who wanted to hang out. Willis picked up Veal and bought beer from a liquor store before the two of them arrived at Christensen's home at around 8:00 or 8:30 p.m. Willis introduced Veal to Christensen.

Later, Willis and Veal left and went over to Kavars's home. As noted, Kavars was Willis's cousin. She had invited Willis over for an early Thanksgiving dinner. Willis introduced Veal to Kavars. While at Kavars's house, Veal cut two lines of methamphetamine with a pocket knife. Kavars and Veal inhaled methamphetamine through a straw, and Willis smoked

marijuana.  After about forty minutes, the three of them went over to Christensen's house.  They likely arrived after midnight.

At Christensen's house, the four of them socialized in the living room.  Willis and Veal drank beer, Kavars drank Vodka, and Christensen drank whiskey.  Veal indicated at some point that he was not feeling well. Willis told him to go outside and get some fresh air.  Veal left for about ten or fifteen minutes.  When he came back in, he sat down briefly, but then he got back up and went to the bathroom.

Shortly thereafter, Veal returned from the bathroom and sat down. Willis and Kavars were talking and laughing when suddenly Willis saw Veal abruptly rise from his seat and shoot Kavars in the throat with a pistol.  Willis could not see the location from which Veal had obtained the gun.  Willis observed blood coming from Kavars's throat, and he watched her take her final breaths.

Veal then turned the pistol on Willis.  Willis pled with him not to shoot.  "I got kids, Peter," he told him.  Veal attempted to fire but the gun jammed.  Veal hit Willis on the right side of the head with the pistol.

As this was happening, Christensen was frozen on the couch.  Willis saw Veal trying to get the jammed round out of the pistol, and Willis started running, believing Christensen would be following him.  By the time Willis reached the side exterior door in the kitchen, the place was dark because the only lamp being used in the house had gone out.  Willis managed to unlock the door in the dark and exit the house.  The last thing he heard Christensen say as he was departing was, "What the f___ are you doing?"

Once out of the home, Willis ran across the street and called 911. Willis later saw Veal leave the house and run south.  Willis remained across the street and called some friends who arrived and helped calm him

down. When the police came, Willis remained at the scene. He gave the police permission to search his vehicle, and he agreed to go to the police station to make a statement.

On November 23, the State filed a trial information in the Iowa District Court for Cerro Gordo County charging Veal with two counts of first-degree murder for the deaths of Kavars and Christensen and one count of attempted murder with respect to Willis. *See* Iowa Code §§ 707.1, .2(1)(*a*), .11 (2017). Because of the publicity surrounding the case, Veal sought a change of venue, and the trial was moved to Webster County.

The parties appeared for trial on Monday, July 10, 2017. Of the Webster County jury pool of 100 people who had returned juror surveys, eighty-seven of them checked in at the courthouse that morning.

Veal is African-American. However, of those in the jury pool who reported their ethnicity, only one juror had self-identified as African-American, and she did not appear on July 10. Webster County is approximately 4.6% African-American.[2]

Before voir dire began, Veal objected to the jury venire. He alleged a violation of his Sixth Amendment right to a fair trial based on underrepresentation and systematic exclusion of African-Americans from the jury selection process.

The court initially gave the defense until later that day to investigate its claim of underrepresentation and systematic exclusion. Further discussions took place on the record during the course of the day, and the

---

[2]In the district court, defense counsel asserted that Webster County was 5.5% African-American according to 2016 census data; the State asserted that it was 4.1%, citing our *Plain* opinion. *See State v. Plain*, 898 N.W.2d 801, 825 (Iowa 2017) (referencing a 4.1% figure for Webster County in 2013). In its amicus brief, the NAACP uses a 4.6% number for the African-American population of Webster County drawn from 2017 census data. The NAACP states that both the 5.5% and 4.1% figures are "clearly erroneous," the 4.1% number from *Plain* being "too old." We take judicial notice of the 4.6% figure, which we believe to be more accurate as of the time of trial in this case.

court ultimately agreed to conduct a hearing on July 11. Because July 10 was the ninetieth day for speedy trial purposes, the court found good cause to extend the speedy trial deadline to July 11.

In an attempt to increase the number of African-Americans in the venire, the court summoned an additional jury pool to appear on the 11th. The court also instructed the sheriff to contact the jurors who had been summoned but had not appeared on the 10th.

With the extra jury pool, there were 153 potential jurors available at the courthouse on July 11.[3] Five were African-American.[4] Meanwhile, defense counsel had completed a historical review of jury questionnaires in Webster County for all of 2016. They reported to the court that the overall African-American percentage of Webster County jury pools that year was approximately 1.3%. Veal moved to strike the jury panel and dismiss the case, arguing the State had systematically excluded and underrepresented African-Americans in its jury pools in violation of the Sixth Amendment and that it was too late to fix the problem given the speedy trial deadline.

The district court denied the motions, noting that the additional pool had redressed to some extent the lack of African-American jurors in the original pool. As the court explained in its subsequent written ruling,

> The Court denied Defendant's motion [to strike the jury panel] based on both the second and third part of the *Duren* [*v. Missouri*, 439 U.S. 357, 99 S. Ct. 644 (1979)] test. The Court found that with the addition of Pool 2 and the availability of additional jurors who self-identified as African-American, at least in part, that the representation of African-Americans was fair and reasonable. As to the third part of the *Duren* test, the

---

[3]The district court found that 153 potential jurors reported, although the parties use the number 157 in their briefs.

[4]Two of them had self-identified as both African-American and Caucasian. The NAACP notes the 2017 census data reflect an additional 2.1% of the population as being of "two or more races."

Court found that there was insufficient evidence that there was systematic exclusion of African-Americans in the jury selection process.

Jury selection then took place.

The initial voir dire panel of thirty-four potential jurors included three African-Americans. One had a prior felony conviction in Iowa, was still on parole, and had been prosecuted by the State's lead prosecutor. He was excused for cause. *See* Iowa R. Crim. P. 2.18(5)(*a*) (allowing a challenge for cause based on "[a] previous conviction of the juror of a felony"). A second potential juror also had a felony conviction, although from another state. His civil rights had not been restored, and he was excused for cause. *See id.*

The final African-American potential juror was S.H. The State's lead attorney had prosecuted S.H.'s father in a prior case resulting in three class A felony convictions. During voir dire, S.H. acknowledged that she had attended part of the trial. The State exercised a peremptory challenge on her. Although the defense lodged a *Batson* challenge to the strike, the district court overruled the challenge finding that the State had offered "a sufficient nondiscriminatory reason for striking that juror."

Following four days of presentation of evidence, a jury found Veal guilty on all charges. On September 12, Veal was sentenced to consecutive sentences of life without parole on the first-degree murder charges and twenty-five years on the attempted murder charge. *See* Iowa Code § 901.5; *id.* § 902.1, .3, .9. Veal appealed, and we retained the appeal.

### III. Standard of Review.

We review constitutional questions de novo. *State v. Plain*, 898 N.W.2d 801, 810 (Iowa 2017). This includes claims of systematic exclusion of a distinctive group from the jury pool in violation of the Sixth Amendment. *Id.* at 810, 821–29. It also includes *Batson* challenges. *See*

*State v. Mootz*, 808 N.W.2d 207, 214, 215–20 (Iowa 2012). Yet, we give "a great deal of deference to the district court's evaluation of credibility when determining the true motives of the attorney when making strikes." *Id.* at 214; *see also State v. Griffin*, 564 N.W.2d 370, 375–76 (Iowa 1997).

We likewise review de novo a district court's decision whether a defendant is competent to stand trial. *See State v. Lyman*, 776 N.W.2d 865, 873 (Iowa 2010), *overruled on other grounds by Alcala v. Marriott Int'l Inc.*, 880 N.W.2d 669, 708 & n.3 (Iowa 2016).

In the speedy trial area, "[w]e review a district court's determination whether the State carried its burden to show good cause for the delay for abuse of discretion." *State v. McNeal*, 897 N.W.2d 697, 703 (Iowa 2017). Also, "[w]e review a district court's decision on claims of prosecutorial misconduct for abuse of discretion, which occurs when 'a court acts on grounds clearly untenable or to an extent clearly unreasonable.' " *State v. Coleman*, 907 N.W.2d 124, 134 (Iowa 2018) (quoting *State v. Krogmann*, 804 N.W.2d 518, 523 (Iowa 2011)). We review rulings on demonstrative evidence for an abuse of discretion. *See McNeal*, 897 N.W.2d at 703. We also review evidentiary rulings regarding the admission or exclusion of prior bad acts for abuse of discretion. *State v. Putman*, 848 N.W.2d 1, 7 (Iowa 2014).

We review challenges to the sufficiency of the evidence for correction of errors at law. *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012). We review a denial of new trial on the ground the verdict is contrary to the weight of the evidence for abuse of discretion. *State v. Ary*, 877 N.W.2d 686, 706 (Iowa 2016).

### IV. Fair-Cross-Section Claim.

Veal maintains that the jury selection process used in Webster County violated the Sixth Amendment requirement that juries be drawn

so as to represent a fair cross section of the community.[5] We addressed a similar claim today in *Lilly*, ___ N.W.2d ___. In *Lilly*, the defendant raised both the Sixth Amendment and article I, section 10. *Id.* at ___. We applied the *Duren/Plain* framework to these issues. *Id.*; *see also Duren*, 439 U.S. at 364, 99 S. Ct. at 668; *Plain*, 898 N.W.2d at 822. We held that under article I, section 10, a defendant establishes the underrepresentation prong of the *Duren/Plain* framework by showing that the representation of a distinctive group in the jury pool falls below the representation in the eligible juror population by more than one standard deviation. *Lilly*, ___ N.W.2d at ___. We held that the representation of the group in the eligible juror population should be assessed using the most current census data, adjusted for any reliable data that might affect eligibility, such as the numbers of persons under the age of eighteen. *Id.* at ___.[6] *Lilly* also held that aggregated data on multiple jury pools could be used, so long as the data were not selective. *Id.* at ___. Additionally, *Lilly* held that a defendant whose jury pool contains at least as high a percentage of the distinctive group as the eligible population has not been aggrieved under the *Duren/Plain* framework. *Id.* at ___.

Turning to the systematic-exclusion prong of *Duren/Plain*, we reiterated in *Lilly* that the defendant must prove "causation," that is, that

---

[5]On appeal, Veal also raises article I, section 10 of the Iowa Constitution, although he does not offer a separate state constitutional analysis. However, in the proceedings below, Veal cited *only* the Sixth Amendment, not article I, section 10. Likewise, the district court mentioned *only* the Sixth Amendment in its ruling. By contrast, Veal did mention the Iowa Constitution when asserting his *Batson* challenge and when moving for change of venue. We have held that a defendant who specifically identifies only a federal constitutional claim in the trial court has not preserved a state constitutional claim. *See State v. Coleman*, 890 N.W.2d 284, 286 (Iowa 2017); *State v. Prusha*, 874 N.W.2d 627, 630 (Iowa 2016). Veal does not argue ineffective assistance on direct appeal based on trial counsel's failure to raise the Iowa Constitution below.

[6]At oral argument, the parties agreed that another valid adjustment would be to exclude persons incarcerated in the state prison in Fort Dodge who obviously could not serve as jurors.

the underrepresentation actually resulted from a particular feature or features of the jury selection system. *Id.* at ___. However, we held that "run-of-the-mill jury management practices" can, under appropriate circumstances, constitute systematic exclusion. *Id.* at ___.

We believe that *Lilly*'s holdings are equally valid when a case is decided under the Sixth Amendment, with two exceptions. We are not persuaded that one standard deviation would be enough to establish the underrepresentation prong for federal constitutional purposes. In *Castaneda v. Partida,* the United States Supreme Court seemingly endorsed two to three standard deviations as an appropriate threshold under the Fourteenth Amendment, and we are not persuaded the Supreme Court would adopt a more lenient standard under the Sixth Amendment. 430 U.S. 482, 496 n.17, 97 S. Ct. 1272, 1281 n.17 (1977). We believe a downward variance of two standard deviations must be shown under the Sixth Amendment.

We also are not persuaded that run-of-the-mill jury management practices can constitute systematic exclusion under the Sixth Amendment. In *Berghuis v. Smith,* the Supreme Court noted,

> Smith catalogs a laundry list of factors in addition to the alleged "siphoning" that, he urges, rank as "systematic" causes of underrepresentation of African–Americans in Kent County's jury pool. Smith's list includes the County's practice of excusing people who merely alleged hardship or simply failed to show up for jury service, its reliance on mail notices, its failure to follow up on nonresponses, its use of residential addresses at least 15 months old, and the refusal of Kent County police to enforce court orders for the appearance of prospective jurors.

559 U.S. 314, 332, 130 S. Ct. 1382, 1395 (2010) (citations omitted). The Court then went on,

> This Court . . . has never "clearly established" that jury-selection-process features of the kind on Smith's list can give

> rise to a fair-cross-section claim. . . . [I]n *Duren*, the Court understood that hardship exemptions resembling those Smith assails might well "survive a fair-cross-section challenge."

*Id.* at 333, 130 S. Ct. at 1395 (citation omitted) (quoting *Duren*, 439 U.S. at 370, 99 S. Ct. at 669).

However, Veal's pool contained only five African-Americans out of 153 potential jurors. This 3.27% figure is below the percentage of African-Americans in Webster County (4.6%) and also below the percentage of eighteen-and-over African-Americans in Webster County (3.9%).[7] Turning to the aggregate data, they show only thirty-five self-identifying African-Americans out of 2637 persons who responded to the juror questionnaire in Webster County in 2016. This is statistically significant even under the higher *Castaneda* threshold. The odds of getting only thirty-five successes out of 2637 trials with p of .046 are $4.05 \times 10^{-21}$. As the State concedes in its brief, "The odds of that occurring randomly . . . are very low." This remains true even if the overall percentage of African-Americans living in Webster County is adjusted to account for the fact that a higher percentage of African-Americans living in Iowa are under eighteen and cannot serve on juries. *See Lilly*, ___ N.W.2d at ___. The odds of getting only thirty-five successes out of 2637 trials with p of .039 in that case are $2.29 \times 10^{-15}$. Other adjustments, such as for the Fort Dodge prison population or for individuals of mixed race, likely would not alter the bottom line revealed by the aggregate data.[8]

---

[7]The State proposes an age-related adjustment of .8559, because 77.7% of all Iowans are eighteen and over (and thus eligible to serve on juries) but only 66.5% of Iowan African-Americans are eighteen and over. Doing the math, 66.5 divided by 77.7 is .8559.

[8]However, it is possible that an adjustment for the Fort Dodge prison population would bring the percentage of jury-eligible African-Americans in the overall jury-eligible population below 3.27%, i.e., below the actual percentage of African-Americans in Veal's juror pool. If so, for reasons we discuss in *Lilly*, Veal would not be able to meet the underrepresentation prong of the *Duren/Plain* framework, and there would be no need to examine aggregate data. *See Lilly*, __ N.W.2d at __. This is a matter on which the parties can present proof on remand. We do not have an adequate record before us.

Yet we note that Veal's counsel aggregated data from jury questionnaires for 2016 only. Veal's trial actually took place in July 2017. The record does not indicate whether similar data were available for the first half of 2017. We cautioned in *Lilly* that aggregate data cannot be gathered selectively. *See id.* at __. Thus, if data were readily available for the first half of 2017, it would be inappropriate to exclude them.

Veal did not attempt to meet the third prong of *Duren/Plain* other than by arguing that systematic exclusion can be inferred from the 2016 aggregated data. As we explained in *Lilly*, that is not enough. *Id.* at ___. The defendant must identify some practice or combination of practices that led to the underrepresentation, and it must be something other than the "laundry list" the Supreme Court declined to condemn in *Berghuis*. *See* 559 U.S. at 332, 130 S. Ct. at 1395.

As in *Plain* and *Lilly*, we believe the appropriate course of action here would be to remand the case. Neither the parties nor the district court had the benefit of today's decisions. A remand will offer Veal a further opportunity to develop his arguments that his Sixth Amendment right to an impartial jury was violated. If the district court concludes a violation occurred, it shall grant Veal a new trial.

## V. Speedy Trial Claim.

Veal next argues his rule 2.33 right to a speedy trial was violated. *See* Iowa R. Crim. P. 2.33(2)(*b*). Veal's argument centers on a one-day delay that occurred from July 10, 2017, to July 11, 2017, while the parties litigated the fair-cross-section claim.

We begin by reviewing the relevant dates. The trial information was filed November 23, 2016. Trial was originally scheduled for January 24, 2017. Veal never waived speedy trial.

On December 30, 2016, Veal applied for a psychiatric evaluation of himself at state expense. On January 4, the court suspended proceedings and ordered such an evaluation. The evaluation was filed on February 28. The evaluator recommended that Veal be referred to the forensic psychiatric hospital for restoration of competency. On March 3, the court approved the referral and continued the suspension of proceedings. On May 15, the reports of two professionals were filed concluding Veal was now competent to stand trial. On May 23, the court found that Veal's competency had been restored and vacated the suspension of proceedings. The court reset trial for June 26.

Veal's counsel shortly thereafter moved to continue trial from June 26 to July 10 based on counsel's unavailability. The State did not oppose this request, and the court granted it. Everyone agreed that July 10 was the last available date within the ninety-day speedy trial window, taking into account the date the trial information was filed and excluding the time spent addressing Veal's competency.

On the morning of July 10, the court convened proceedings intending to begin the trial. Veal's counsel observed there were no minorities and sought until the afternoon to explore racial disparity and systematic exclusion in the jury venire. Further discussions occurred later that morning and Veal's counsel asked for additional time past the 10th to investigate systematic exclusion. The State resisted the request. It noted that Veal had been in possession of the list of potential jurors earlier and could have raised the fair-cross-section claim before the day of trial. The State also asked the court to find good cause for extending the ninety-day deadline if it granted more time.

The court decided to give Veal's counsel until the following day, i.e., the 11th, to conduct research and discovery on the fair-cross-section claim. On the question of speedy trial, the court ruled,

> THE COURT: To grant the motion to -- to allow time to do discovery and make a further record regarding whether an under-representation is due to the systematic exclusion of a group in the jury selection process necessarily requires trial to begin after the 90 days. I think there has to be a conscious choice of that or at least be aware of that.
>
> So given those situations, that they're really in conflict, counsel for the defendant, I just want to, you know, understand for the record, knowing that you're at the 90th day, you are asking for additional time to do further discovery or present further arguments on this matter to extend -- and that would extend this case past 90 days. Is that your position? MR. KLOBERDANZ: Yes, Your Honor.
>
> THE COURT: All right. And you've discussed that with your client also? MR. KLOBERDANZ: Yes, Your Honor, we have.
>
> THE COURT: All right. Based upon that record, I will agree to give defense counsel additional time. I find, however, that there is good cause shown for extending the time to present this case for trial:
>
> As Mr. Brown has said about four times, the State is ready to proceed here today. The jury panel was here. We were ready to begin the case. The jury panel is coming back at 1:00, so we could continue the case yet today;
>
> That the circumstances where Defendant's motion was first raised on Friday of last week [July 7], frankly, without any time for any of us to do anything about it, and then raised today, makes the situation where it would have been impossible to deal with this matter before the conclusion of the 90 days;
>
> That this is the defendant's motion with full knowledge that this would require trial to begin after 90 days.
>
> And in light of that, the defendant has chosen to seek the additional time to exercise his rights under the *Plain* case to do some further discovery; and, therefore, I think that the -- any delay in the case would -- would be attributable to the defendant and there'd be good cause for -- for not getting this case tried within 90 days.

The next day, July 11, a second pool of potential jurors had been summoned to add to the first pool. Veal, meanwhile, provided additional data based on jury pools in Webster County for all of 2016 and formally moved that his jury venire be stricken as not reflecting a fair cross section of the community. In addition, Veal moved for dismissal of the case based on violation of his speedy trial rights, reasoning that it was the State's duty to provide a jury panel representing a cross section of community within the ninety-day deadline. The court denied both motions, reiterating on the speedy trial issue that "there was good cause to go past the 90 days." At this point, the parties proceeded with jury selection.

Iowa Rule of Criminal Procedure 2.33(2)(*b*) provides,

> If a defendant indicted for a public offense has not waived the defendant's right to a speedy trial the defendant must be brought to trial within 90 days after indictment is found or the court must order the indictment to be dismissed unless good cause to the contrary be shown.

The good cause determination focuses on "the reason for the delay." *McNeal*, 897 N.W.2d at 704 (quoting *State v. Winters*, 690 N.W.2d 903, 908 (Iowa 2005)). Yet we also consider "surrounding circumstances such as the length of the delay, whether the defendant asserted his right to a speedy trial, and whether prejudice resulted from the delay." *Id.* Here the delay was only one day, it was precipitated by the defendant's request for more time to investigate and present evidence on the fair-cross-section issue, and the defendant cites no prejudice that resulted from this single-day postponement. In our view, the district court carefully balanced a number of concerns. "[P]utting ourselves in the shoes of the district judge," we find no abuse of discretion. *See id.* at 708.

Veal denies there was good cause for any delay. Treating the judicial branch and the county attorney's office collectively as "the State," Veal

maintains it was the State's obligation not just to be ready to try the case on July 10, but also to have a jury pool meeting constitutional standards available that day. Thus, Veal's argument would effectively transform *any* fair-cross-section violation not remedied before the ninety-day deadline into a speedy trial violation.

Veal cites no authority for his effort to conflate substantive legal claims with speedy trial violations. We are not persuaded. By Veal's logic, any time we find on appeal that a defendant is entitled to a new trial, we should also find that "the State" violated the defendant's speedy trial rights by committing a legal error that resulted in a new trial beyond the ninety-day deadline. This would go too far.

### VI. *Batson* Challenge.

Veal contends the district court erred in overruling his *Batson* challenge to the State's exercise of a peremptory strike on an African-American prospective juror. *Batson* holds that a defendant may establish a prima facie case of racial discrimination by showing that the prosecutor has exercised one or more peremptory challenges to remove from the venire members of a racial minority and that these facts and other relevant circumstances raise an inference of discrimination. *See Batson v. Kentucky*, 476 U.S. 79, 96–98, 106 S. Ct. 1712, 1723–24 (1986). Such a showing shifts the burden to the prosecution to come forward with a race-neutral explanation for exercising the challenges. *Id.*

During voir dire of this juror, the lead prosecutor recognized her as the daughter of a person he had prosecuted successfully for three class "A" felonies. The juror had attended two days of her father's trial. The juror stated during voir dire that she believed her father was treated fairly. She conceded he was "involved" in the crimes but said she did not "know for sure if he was the only person."

The State exercised one of its peremptory strikes on this juror. Veal's counsel objected on the basis of *Batson* and the prosecutor provided the following explanation:

> So I'll tell you why we struck Ms. [H.]. Ms. [H.] is the daughter of [S. H.]. I prosecuted [S. H.] for three class A felonies in this county; kidnapping, sexual abuse, and murder, all in the first degree. It was a very high-profile case, a very brutal killing . . . .
>
> At the time of the -- the crime -- I can't tell you the year or the date. I do lose dates -- but Ms. [H.], I believe, was right around the age of 17 years old. I vaguely remember her being present at least at part of the -- if it wasn't the trial, it would have been part of the pretrial proceedings. She was with her mother . . . .
>
>    . . . .
>
> I mean, I can't keep a juror on whose father I prosecuted for a class A felony. I mean, there -- there -- she may have latent hostility towards me personally because of what I did. Her expressions that she made on the -- on the record, she said that his sentence was fair. She doesn't appear to have a whole lot of contact with him; but that's not a risk I can take, particularly under the circumstances of this case.
>
> We have -- The allegation is that Mr. Veal killed two people. At least based in part on what our expert has said, he may be blaming a -- a second person, may be blaming Ron Willis, claiming that he didn't -- that Mr. Veal's claiming that he didn't do the crime that he's accused of.
>
> And Ms. [H.] raised that issue with me concerning the fairness and what she thought about the trial of her father, [S. H.], whenever she said somebody else might have been involved.
>
> I can tell you right now, in the [S. H.] case, no one else was involved. We had strong physical evidence against him that he was the sole perpetrator of those three crimes. That's what concerns me about Ms. [H.]. I think those are race-neutral reasons to strike her.
>
> If she were white, I would make the exact same objection to having her -- or make the same exact strike that I would. And it -- this has nothing to do with her race; it has everything to do with her background and who her father is and the fact that I was directly involved in that case and that

prosecution. So for those reasons, that's why we exercised our preemptory challenge.

One other thing I would tell you is we did wait to the end to strike her with No. 10 because I thought the defense might actually challenge her for the same reason; that she had, you know, had this -- this connection to a previous high-profile violent crime here in the county. I could see actually how that they could maybe justify a preemptory strike on that basis, as well. I thought that would alleviate this problem of having to articulate why we're doing it; but apparently that didn't happen, so that's why we took her with No. 10.

Just don't want you to read anything else into that. That's why we waited till the end. So those are our reasons, and we would ask that our strike be upheld.

Defense counsel did not question the State's motive for striking this juror, but argued that her voir dire responses gave no indication of bias. Because this juror was the last available African-American juror, defense counsel "ask[ed] the Court to hold the State to a very high standard given the circumstances here."

The district court overruled Veal's *Batson* challenge, stating,

Prosecution of a potential juror's father in a -- in an apparently class A case by the same attorney as is in this case, I think, is a sufficient nondiscriminatory reason for striking that juror; and that's why I'm going to overrule your objection.

Here and below, Veal insists that a nondiscriminatory reason for striking the last African-American juror is insufficient and that we should adopt something like a cause requirement in those circumstances. This is contrary to our precedent. In *Griffin*, we upheld a prosecutor's use of strikes on the only two African-American members of the panel. 564 N.W.2d at 375–76. We noted that the prosecutor's explanation "need not rise to the level justifying exercise of a challenge for cause" but must be race-neutral and "related to the particular case to be tried." *Id.* at 375 (quoting *Batson*, 476 U.S. at 97–98, 106 S. Ct. at 1723–24). We affirmed the district court's acceptance of the prosecutor's explanation that both

jurors had previously sat on a jury that convicted the defendant of lesser included offenses in a willful injury case. *Id.* at 376. We stated that "[t]hese qualify as racially-neutral reasons" and "[t]here is nothing to suggest they were a mere pretext." *Id.* The same observations can be made here; indeed, to an outsider, the prosecutor's reason for striking juror H. here seems more substantial than the reasons given in *Griffin.*

More recently, in *Mootz*, we said that a *Batson* challenge should not prevail "merely because the judge does not find the reason given to be persuasive." 808 N.W.2d at 218. Rather, "[t]he reason given must, in and of itself, violate equal protection." *Id.*

Veal argues that allowing prosecutors to use peremptory strikes on prospective jurors who are relatives of individuals they previously prosecuted "disproportionately implicates African-American potential jurors." We are aware of the disproportionate impact when jurors can be removed based on prior interactions with law enforcement. *But see id.* at 219 ("Our cases have repeatedly noted that a juror's interactions with law enforcement and the legal system are a valid, race-neutral reason for a peremptory challenge."). But this case involved a special set of circumstances—a prosecutor's use of a peremptory strike on a juror because the same prosecutor had sent her father to prison for the rest of his life. We affirm the district court's ruling that this was a valid, race-neutral reason for rejecting the *Batson* challenge.

**VII.  Prosecutorial Error or Misconduct.**

Veal contends that the prosecutor was guilty of misconduct in several instances, requiring reversal of his convictions and a new trial. We have drawn a distinction between prosecutorial misconduct and prosecutorial error. *State v. Schlitter*, 881 N.W.2d 380, 392–94 (Iowa 2016). The former requires an intentional violation of a clear legal or

professional standard; the latter involves a mistake or an exercise of "poor judgment." *Id.* at 394 (quoting Shawn E. Minihan, *Measuring Prosecutorial Actions: An Analysis of Misconduct Versus Error,* Prosecutor, Dec. 2014, at 25). We will treat Veal's claim as one of prosecutorial misconduct *or error*.

Veal first takes issue with the following exchange during voir dire:

> MR. BROWN: . . . Ms. [M.], I'll come back to you. I've mentioned multiple times here that this is a murder case and an attempted murder; right? Okay. And I think with Ms. [P.], she talked about a case that she was on that dealt with a -- serving a minor; correct? Okay. So obviously when you compare the two, that's, you know, certainly minor compared to -- to a murder. Would you agree? MS. [M.]: Yes.

> MR. BROWN: Okay. So looking at comparing those two, would you say that we would have to have more evidence in a murder case than we would in someone who sells alcohol to a minor? MS. [M.]: Yes.

> MR. BROWN: Okay. I get that answer a lot too. Do you realize that the burden in those two cases is exactly the same, the definition would be the same? Do you follow me? MS. [M.]: Uh-huh.

> MR. BROWN: So it'd be beyond a reasonable doubt as it's defined by the judge here. The same instruction would be given in the case like what Ms. [P.] had talked about. So the burden is the same in the sense that it's defined the same. Do you follow me? MS. [M.]: Yes.

> MR. BROWN: Okay. So would you hold us to the burden as the Judge gives it to you -- MS. [M.]: Yes.

> MR. BROWN: -- and not think that we have to have something more than that? MS. [M.]: Correct.

Veal's counsel shortly thereafter moved for a mistrial based on this exchange. He said, "I don't know if that went over the line but want to bring it to the court's attention. . . . It was a comparison of selling alcohol to minors and -- and murder . . . ." He then added that when a prosecutor compares two crimes it is "at least arguably a comment on potential punishment; and certainly that's not appropriate or proper."

The court denied the motion for mistrial. It recalled the reference as an effort to equate the burden of proof for both crimes. It did say that the comment could be viewed as one on possible punishment, and counsel should "avoid that sort of discussion in the future."

We find no abuse of discretion in the denial of a mistrial. Jurors didn't fall off the turnip truck and into the courtroom. Inevitably, a prospective juror is going to regard murder as a more serious crime than selling alcohol to minors and assume it has a more severe punishment. The point of the prosecutor's voir dire questioning was not to comment on punishment but to make sure jurors would be willing to accept the proposition that all criminal cases are subject to the same "beyond a reasonable doubt" burden of proof. That was a legitimate purpose.

On appeal, Veal argues that the prosecutor's contrast between murder and selling alcohol to minors "[p]lanted in the jurors' mind the anchor of a minor punishment . . . ." This seems unlikely to us. No one referred to the actual punishment for either crime.

Veal also complains that during trial, one of the prosecutors incorrectly told the jury that the defense had seen a particular diagram before. The defense immediately disputed that statement in front of the jury. The diagram was not admitted at that time. During the next break, outside the presence of the jury, it was established that both sides were partly right: the diagram had been provided to defense counsel, but some additions had been made. Over objection, the court received the diagram into evidence and rejected any argument that the changes to the diagram had prejudiced the defense.

Notably, defense counsel did not then assert prosecutorial misconduct or error. Defense counsel did not seek any relief from the prosecutor's previous statement about the diagram, such as a curative

instruction. And on appeal, defense counsel is not even appealing the decision to admit the diagram. We find no reversible error.

Veal also complains about comments made by the lead prosecutor during his rebuttal closing argument. Over objection, the prosecutor engaged in some sharp criticism of defense counsel's closing argument. These included analogizing the defense argument to the times when the prosecutor's daughter would say, "Really, Dad? Really?" to her father without having any "substance." The prosecutor also argued as follows:

> Mr. Kloberdanz characterized this as a horrible tragedy. Well, I would disagree with this. You know what a horrible tragedy is? When an infant dies in its crib for no reason. When a father of three, driving home from work, his car slides off the highway and is killed in a crash for no reason.

> This is not a horrible tragedy, this is a cold-blooded killing. It is a brutal, senseless murder and a near-miss on Ron Willis. That's the proper way to characterize what occurred.

> At the end of Mr. Kloberdanz's statement -- at his closing argument to you, he told quite a story. Wow. What was all of that based on? Nothing. What -- You would have thought Mr. Kloberdanz was there, the way he told that story.

> That Ron Willis got hit in the head with the lamp, that he switched clothes with Peter Veal, that he did all those things. Holy cow. Wow.

The district court overruled defense counsel's objections to this line of argument but told the prosecutor he "may be pushing" the line of what is proper. At that point, the prosecutor shifted into a detailed discussion of the evidence.

We have indicated that a prosecutor may attack the defense's "theory of the case" so long as he or she does not make "denigrating or inflammatory comments of a personal nature aimed at defense counsel." *Coleman*, 907 N.W.2d at 140. In *Coleman*, we found no violation of the defendant's right to a fair trial when the prosecutor commented that "the

defense, they want to—to blow a lot of smoke around the law, make it as fuzzy as possible" and "the defense will hide behind [a] cloud of assumption." *Id.* at 139–41 (alteration in original).

Here the prosecutor's comments may have veered improperly into personal attacks on defense counsel, e.g., "You would have thought Mr. Kloberdanz was there, the way he told that story." Having said that, we do not find that the comments resulted in prejudice that denied Veal a fair trial. *See id.* at 140. As the district court noted in denying the motion for new trial, "[T]he evidence against [Veal] was strong." Veal's theory of defense was implausible.[9]

**VIII. Firearm Demonstration.**

During trial, the State's firearms expert Victor Murillo used a .380 semiautomatic pistol from the Iowa Division of Criminal Investigation's (DCI) reference collection for demonstrative purposes. This was done because the actual murder weapon had carcinogenic dye on it. The demonstration weapon was the same make and model as the murder weapon, although with some design changes.

Murillo testified that the murder weapon had jammed after it was used to kill Kavars because a faulty cartridge became stuck inside of the chamber. To help illustrate his testimony, the State asked Murillo to

---

[9]In closing argument, Veal's counsel advanced the theory that Willis was actually the murderer of both Kavars and Christensen. According to defense counsel, Willis sent Veal outside Christensen's house wearing Willis's clothing and carrying the knife used to murder Christensen so Veal could be a "fall guy." According to this theory, Willis managed to clean himself up to eliminate all traces of blood on his body and his whereabouts before calling 911 to contact police.

In addition to its overall implausibility, this theory fails to explain why the bloody footprints in the house matched Veal's shoes, how Veal ended up with a cut on his hand, why Veal ran away from the police whereas Willis cooperated, and how Willis's skin tissue ended up on the slide of the gun.

display the operation of a semiautomatic .380 using the sample weapon from DCI's lab.

At trial and on appeal, Veal claims the demonstration should not have been permitted because the demonstration weapon differed from the murder weapon in certain respects. However, we find no abuse of discretion. *See State v. Liggins*, 524 N.W.2d 181, 189 (Iowa 1994) (noting the court's "broad discretion in permitting demonstrative evidence to explain or illustrate the testimony of witnesses"). The demonstration weapon was not admitted into evidence and it was made clear that it was not the original. *See McNeal*, 897 N.W.2d at 709 ("It was made clear to the jury that the replica [sledgehammer] was not the original. The replica was not admitted into evidence."). Veal's counsel was able to make any differences clear when he cross-examined Murillo.

Veal urges that the demonstration had little relevance, because "there was no dispute over how the gun operated" and "[t]he dispute was over who fired the gun . . . ." To the extent that is true, though, it would also mean that the demonstration had little potential for resulting in unfair prejudice.

## IX. The Defendant's Competency Hearing.

On May 15, 2017, two examining professionals reported that Veal was properly oriented as to time, place, and current events and could perform mental tracking tasks and a memory test without difficulty. According to the reports, Veal also was able to list the charges against him and identify the range of potential sentences; he could confirm that he had met with his defense attorney five or six times and that he was able to work with him; he understood the roles of his defense attorney, the prosecutor, the judge, and the jury; he understood what a plea bargain would entail; and he realized that he should advise his defense attorney if

a witness wasn't telling the truth. Veal's scores on tests of basic legal concepts and skills to assist defense were described as "somewhat higher than average compared to the general population."

These evaluations concluded that Veal had a factual and a rational understanding of the legal proceedings and could assist his defense counsel. Thus, they opined he was competent to stand trial. *See* Iowa Code § 812.3(2); *id.* § 812.5 (defining the issue as whether "the defendant is suffering from a mental disorder which prevents the defendant from appreciating the charge, understanding the proceedings, or assisting effectively in the defense").

Following the receipt of both evaluations, a competency hearing took place on May 23. The evaluations were admitted into evidence. For the defense, Veal's mother testified that she had visited her son twice recently for brief periods of time. The first time, Veal was rocking and looking behind him. His mother got "the feeling he was paranoid." The second time, Veal did not behave like that. However, during this second visit, Veal asked Veal's mother about how his sister was doing just a few minutes after Veal's mother had already spoken to Veal about his sister.

Defense counsel also represented that in their encounters with their client, Veal had not asked questions of his own and often had not responded to their inquiries. Defense counsel urged that there was a serious question whether Veal was listening to his attorneys—rather than listening to voices—and that Veal was having a hard time paying attention.

After considering the evidence, the district court concluded that Veal was competent to stand trial. On our de novo review, we agree. The two expert evaluations on which the district court relied were detailed and thorough. As the district court observed, the testimony of Veal's mother was based on only two fifteen-minute visits with her son. Even accepting

the professional statement of Veal's counsel that they were having trouble interacting with their client, the examining psychiatrist and the examining psychologist covered this same subject in considerable detail in their evaluations. Based on their objective testing and personal observations, they found Veal would be able to work with his counsel.

In sum, the State carried its burden of proving by a preponderance of evidence that Veal's competency had been restored. *See id.* § 812.8(5). Notably, Veal cites nothing from the trial itself that might have suggested he was *not* competent to stand trial. *Cf. State v. Einfeldt*, 914 N.W.2d 773, 776–77 (Iowa 2018) (discussing behavior and statements of the defendant during trial).[10]

**X. Excluded Evidence.**

Veal challenges the district court's exclusion of evidence pertaining to Willis. The limited evidence essentially fell into two categories: (1) Willis's criminal history and (2) information that a defense witness, M.B., had concerning Willis.

**A. Willis's Criminal History.** We begin with the admitted evidence. The defense was allowed to impeach Willis with the fact that he had been convicted in 2009 on a felony drug charge. The defense was also allowed to argue that Willis had been found by the police to have a small amount of marijuana in his car on November 17, 2016, and was not

---

[10]Veal frames the issue on appeal as whether a "new" competency evaluation should have been ordered. In the trial court, Veal's position was that *additional* evaluation was needed to determine whether Veal was suffering from schizophrenia or not. Regardless of how the issue is characterized, the role of the trial court as of May 23 was to determine Veal's competency to stand trial in light of the expert evaluations and other evidence before it. *See* Iowa Code §§ 812.5, .8(5).

prosecuted. Similarly, the defense was able to argue that Willis had not been prosecuted as a felon in possession of a firearm.[11]

However, the defense was not allowed to bring out Willis's drug charges in Minnesota that were pending at the time of trial. Likewise, evidence of Willis's early June 2017 misdemeanor drug possession conviction was excluded. Also excluded was the fact that Willis did not serve the mandatory minimum two days in jail on the June 2017 conviction and the possibility that the charge could have been (but was not) enhanced to a felony. The court reasoned that misdemeanors and unproved charges are not normally admissible, and there was no basis for concluding that Willis was the beneficiary of some kind of deal to receive favorable treatment.

We see no abuse of discretion here. Allowing the defense to present this additional evidence of Willis's criminal history could have led to an unneeded and time-consuming sideshow. Willis made a 911 call to police voluntarily on November 17, 2016, to report that Veal had shot Kavars. Willis's version of events never changed. While defense counsel should have broad leeway to question prosecution witnesses facing criminal exposure, this record contains no suggestion that any sort of deal was made with Willis. There would have been no need for a deal: Willis had reported the criminal episode of his own volition. Moreover, Veal's defense theory was that Willis had shot Kavars and stabbed Christensen to death. If that were true, Willis had plenty of motive to pin the crimes on Veal and did not need a "deal" as motivation.

**B. M.B.'s Testimony.** Again, we begin with the admitted evidence. M.B. was Christensen's live-in girlfriend during the last few months before

---

[11]Willis consented to a search of his vehicle, a point the prosecution used at trial to show that Willis was not trying to hide anything from the police.

his death. She testified that she witnessed Willis delivering drugs to Christensen. She testified that Christensen was spending a lot of money on drugs and his financial situation was deteriorating. She also testified that about two weeks before November 17, 2016, Willis had date-raped her and she reported this to Christensen. M.B. further testified that Christensen was upset and mad at Willis upon hearing this. And M.B. testified that Willis kept drugs and a handgun in his car.

M.B. was not allowed to testify that Christensen had "a significant drug problem," how much Christensen was spending on drugs, or that she was "scared of" Willis.

Veal claims that these limits on M.B.'s testimony significantly interfered with his ability to present his case. In particular, Veal contends that the jury got to hear of a "rift" between Willis and Christensen but did not get to hear "what the rift was about." We disagree. Veal was able to demonstrate that Willis had a motive to kill Kavars and Christensen. We find no abuse of discretion.

## XI. Sufficiency of the Evidence.

Veal argues the district court should have granted his motion for judgment of acquittal on the ground there was insufficient evidence to support his convictions for the first-degree murder of Christensen and Kavars and for the attempted murder of Willis. Alternatively, Veal urges that his motion for new trial should have been granted on the ground that the verdicts were against the weight of the evidence. We disagree with both contentions.

Willis testified that Veal shot Kavars in the throat before turning the gun on Willis and attempting to shoot Willis. When the pistol jammed, according to Willis, Veal struck Willis in the head and then attempted to free the lodged round. The pistol recovered at the scene by police had a

jammed round in the firing chamber. Willis's skin tissue was also found on the pistol's slide consistent with his being struck on the head with it.

After Willis fled the scene, Veal was the only person remaining in the house with Christensen. Christensen's dead body was later found in a pool of blood with twenty-five stab wounds. Christensen's blood was all over Veal's jeans and shoes. The bloody footprints in the house matched Veal's shoes. A trail of Christensen's blood followed Veal's path out of the house. Along the path were Veal's discarded bloody shirt and bloody knife. Again, Christensen's blood was on these items.

Veal's improbable defense theory was that Willis had both shot Kavars and stabbed Christensen, then forced Veal to put on Willis's bloody clothes, then cleaned himself up so he would have no trace of Christensen's blood, and then left the house and called 911. The jury was entitled to reject this theory which was not supported by the weight of the evidence.

### XII. Conclusion.

For the foregoing reasons, we conditionally affirm Veal's conviction and sentence, but remand this case for further consideration of Veal's claim that his jury was not drawn from a fair cross section of the community in violation of the Sixth Amendment.

**AFFIRMED ON CONDITION AND REMANDED WITH DIRECTIONS.**

Cady, C.J., concurs.

Wiggins and Appel, JJ., concur as to divisions IV, V, VII, VIII, IX, X, and XI, and dissent as to division VI.

Waterman, Christensen, and McDonald, JJ., concur as to divisions V, VI, VII, VIII, IX, X, and XI, and dissent as to division IV.

**CADY, Chief Justice (concurring specially).**

I join in each division of the majority opinion by Justice Mansfield. In particular, I agree that the district court in this case properly applied the *Batson* test to reject the challenge to the removal of the last African-American juror from the panel. *See Batson v. Kentucky*, 476 U.S. 79, 96, 106 S. Ct. 1712, 1723 (1986). In other words, the district court properly applied our current law.

Nevertheless, I acknowledge problems inherent in the exercise of peremptory challenges and agree with the separate opinion by Justice Wiggins that the solution in the future is to do away with the use of peremptory challenges. Thus, I am not in favor of trying to modify our governing rules to better detect bias in discretionary decision-making so much as I am in eliminating discretionary practices altogether that allow implicit bias to exist undetected. For that reason, I also concur in the overall theme of the thoughtful analysis and criticism of peremptory challenges discussed in the separate opinion by Justice Appel.

**WIGGINS, Justice (concurring in part and dissenting in part).**

I join Justice Appel's opinion in this case. However, I think it is time to abolish peremptory challenges in Iowa. The Code and our rules provide for reasons why a court should not seat a juror. Iowa Code §§ 607A.4, .5, .6 (2019); Iowa R. Crim. P. 2.18(5); *accord* Iowa R. Civ. P. 1.915(6). And, if the rules are inadequate, we should amend our rules. If a person can sit as a juror under the Code and rules, a party should not be able to strike that otherwise qualified juror.

As Justice Marshall pointed out in his concurring opinion in *Batson v. Kentucky*, "[m]isuse of the peremptory challenge to exclude black jurors has become both common and flagrant." 476 U.S. 79, 103, 106 S. Ct. 1712, 1726 (1986) (Marshall, J., concurring). Even after *Batson,* I see the same problem in Iowa. In the majority of the cases, the reasons given by prosecutors in response to a *Batson* challenge appear to be pretexual. Washington General Rule 37, cited by Justice Appel in his opinion, helps but does not solve the problem. The only way to stop the misuse of peremptory challenges is to abolish them in Iowa and require judges to enforce rigorously challenges for cause. If our judges would enforce our rules on challenges for cause, the district court can be confident that it sat an impartial jury.

The practice of allowing peremptory challenges started in England in the 1300s. Raymond J. Broderick, *Why the Peremptory Challenge Should Be Abolished*, 65 Temp. L. Rev. 369, 371–72 (1992). In 1988, Parliament abolished peremptory challenges altogether. *Id.* at 373. Parliament's concern was "that defense lawyers were manipulating the peremptory challenge to pack juries with biased individuals, thereby defeating the ability of random draw techniques to ensure a representative

petit jury." *Id.* When prosecutors systematically remove minorities from juries, we should do what Parliament did and abolish peremptory challenges.

Peremptory challenges are a creature of our rules and are not constitutionally required. All that is required under our Constitutions is that a defendant receives a trial by an impartial jury. U.S. Const. amend. VI; Iowa Const. art. I, sec. 10. Abolishing peremptory challenges will go a long way toward fulfilling that constitutional obligation.

Therefore, I think we should begin a discussion to remove peremptory challenges from our rules.

**APPEL, Justice (concurring in part and dissenting in part).**

In this case, I concur with the majority opinion except for division VI (the *Batson* challenge).

Today, we consider three important cases related to this court's ongoing efforts to ensure that the notion of equality before the law applies to African-Americans in our justice system and in our jury system. As professional hair splitters, it is easy for us to dive directly into the intricacies of the cases, disappear, and resurface with narrowly diced results in each case.

Before doing so, however, I think we should put these cases in a larger perspective in three ways. First, we should recognize the profound and persistent problem of racial discrimination in our society. Second, we should put each of the cases we decide today in their larger context within our legal system. We should decide these cases only after we have understood that context. Third, we should recognize the role of state courts in working to develop a system of justice where fair and impartial juries and freedom from discrimination are the norm and not the exception.

## I. Contextualizing Civil Rights in Jury Cases.

**A. The Persistent, Stubborn, and Ongoing Struggle for Racial Equality.** Achieving the promise of equality before the law for African-Americans, in Iowa and across the nation, has been a difficult, painful, and ongoing challenge. The bitter reality of chattel slavery, accommodated in the United States Constitution and protected in the federal courts, was dismantled by the American Civil War, motivated at least in part and for some by the founders' stirring phase that "all Men are created equal." The Declaration of Independence para. 2 (U.S. 1776); Stephen L. Mikochik, *A*

*Celebration of Equality*, 64 Temple L. Rev. 371, 371 (1991) ("The Constitution endured slavery until the Civil War . . . .).  The war was won and the victors imposed amendments to the United States Constitution abolishing slavery.  *See* U.S. Const. amends. XIII, XIV, XV [hereinafter Reconstruction Amendments].

But the struggle for equality before the law did not end at Appomattox or after enactment of the postwar constitutional amendments.  It had only begun.  After a brief period of hope and some accomplishment, the reforms of reconstruction, fiercely and violently opposed in the South and losing political support in the North, were tragically abandoned.  *See* David Lyons, *Corrective Justice, Equal Opportunity, and the Legacy of Slavery and Jim Crow*, 84 B.U. L. Rev. 1375, 1376 (2004).  The oppressive slave regime was replaced by Jim Crow in the states of the former confederacy and a pattern of less blatant but hurtful discrimination in other areas of the country.  *Id.* at 1376–77.  Although slavery passed from the scene, persistent and explicit discrimination against African-Americans remained part of the American landscape for almost a hundred years.  *Id.*

Iowa has, in some ways, been a leader in efforts to ensure racial equality.  The trilogy of our early civil rights cases have been justly and widely celebrated.  The differences in tone and content between *In re Ralph* and the proslavery *Dred Scott* decision are stark.  *Compare In re Ralph*, 1 Morris 1, 7 (Iowa 1839), *with Dred Scott v. Sandford*, 60 U.S. 393, 403 (1857), *superseded by* U.S. Const. amends. XIII, XIV.  Leading Iowa politicians, constitutional convention members, lawyers, and eventually judges condemned the proslavery declarations of federal courts culminating in *Dred Scott*.  *See State v. Short*, 851 N.W.2d 474, 484 (Iowa 2014).  When the United States Supreme Court invalidated the Federal

Civil Rights Act of 1866 in 1883, the Iowa legislature in its next session enacted a state civil rights act outlawing, at least to a degree, racial discrimination in a variety of settings. Russell E. Lovell, *Shine on, You Bright Radical Star:* Clark v. Board of School Directors (of Muscatine)—*The Iowa Supreme Court's Civil Rights Exceptionalism*, 67 Drake L. Rev. 175, 195–96 & n.121 (2019) [hereinafter Lovell].

Yet, the early version of the Iowa civil rights legislation was not routinely enforced by elected county attorneys. *Id.* at 196 n.121. And, this court's decisions were not always encouraging. For instance, in *Brown v. J.H. Bell Co.,* 146 Iowa 89, 96–97, 123 N.W. 231, 233–34 (1909), the Iowa civil rights statute was applied very narrowly in the case of a farmers market-type activity that included a food court. The *Brown* court concluded that the food court was not "a place of amusement" under the Act. *Id.* at 99, 123 N.W. at 234.

It would certainly be a mistake to conclude that our state was been free of discriminatory animus in the years following reconstruction. For example, the soda fountain at the Katz drug store in downtown Des Moines, an iconic feature of the city's postwar cultural landscape, declined to serve African-American patrons in the years after World War II. *See State v. Katz*, 241 Iowa 115, 116, 40 N.W.2d 41, 43 (1949). After a combination of political protest, civil litigation, and criminal prosecution, the blatant discrimination in the heart of Iowa's capital city was discontinued. *See id.* at 117, 40 N.W.2d at 43. The *Katz* episode occurred more than eighty years after the last shot was fired in the Civil War.

Shortly after our decision upholding the criminal conviction in *Katz*, the United States Supreme Court in *Brown v. Board of Education*, 347 U.S. 483, 493, 74 S. Ct. 686, 691 (1954), consistent with much earlier Iowa judicial precedent, declared that racial segregation in public schools

violated the nation's commitment to equal protection. The reaction in some quarters to *Brown*, of course, was bitter. Leading southern politicians produced the Southern Manifesto, a declaration defiantly blasting the courts as overstepping their authority. Reva B. Siegel, *Equality Talk: Antisubordination and Anticlassification Values in Constitutional Struggles over* Brown, 117 Harv. L. Rev. 1470, 1488–89 & n.59 (2004). Yet, a decade later, after events including the murders of civil rights workers and the terrorist bombing of a Birmingham church, Iowa strengthened its Reconstruction Era statutory regime protecting civil rights, while important and comprehensive federal legislation protecting civil rights and voting rights was enacted. *See* Iowa Civil Rights Act of 1965, Iowa Code ch. 216 (2019); Kenneth W. Mack, *Foreword: A Short Biography of the Civil Rights Act of 1964*, 67 SMU L. Rev. 229, 242 (2014); Margaret M. Russell, *Cleansing Moments and Retrospective Justice*, 101 Mich. L. Rev. 1225, 1226 (2003).

No one, however, believes that the important judicial and legislative developments of more than fifty years ago has ended racial discrimination in America. For the most part, however, political and cultural developments, supported by judicial, legislative, and executive actions, have driven overt racial discrimination underground. Expressly discriminatory political appeals of "segregation forever" have generally disappeared from the public square. But the fact that most overt racism is now under the radar does not mean it does not exist. *See Rose v. Mitchell*, 443 U.S. 545, 558–59, 99 S. Ct. 2993, 3001 (1979) (noting that more than a century after the Civil War, "racial and other forms of discrimination still remain a fact of life, in the administration of justice as in our society as a whole").

Further, social scientists have now thoroughly documented what has been known for decades, namely, that all of us—judges, lawyers, legislators, and jurors—have unconscious or implicit biases. Michael B. Hyman, *Implicit Bias in the Courts*, 102 Ill. B.J. 40, 42 (2014) ("Implicit bias weaves its way through the legal system in interactions between attorneys, clients, jurors, and judges."). Many of these unconscious biases may be harmless, if not helpful, to daily living. But to the extent implicit bias reflects unconscious racial bias, it can be a driver in perpetuating racial inequality. *Id.* at 41–42. And there is reason to believe that many of us— including intelligent and conscientious people of good will—have unconscious racial bias shaped by our culture and experience. *Id.* at 43 ("[J]udges, like everyone else, harbor their own set of implicit biases, shaped by their experiences and identity . . . .").

The need to address racial bias continues in law enforcement and in the courts. As noted by Justice Wiggins in *State v. Plain*, 898 N.W.2d 801, 830 (Iowa 2017) (Wiggins, J., concurring specially), "A recent report by The Sentencing Project found 25.8% of Iowa's prison population was black, while blacks made up only 3.1% of Iowa's population." According to a 2016 study, African-Americans in Iowa are seven times more likely than whites to be arrested for drug possession, even though all available studies indicate that drug possession and use among African-Americans and Caucasian Americans is roughly the same. Human Rights Watch & Am. Civil Liberties Union, *Every 25 Seconds: The Human Toll of Criminalizing Drug Use in the United States* 41, 46 (2016). Iowa's racial disparity in drug possession arrests was the second worst in the country. *Id.* at 46. Racial discrimination persists.

The bottom line is that the struggle for equal justice before the law is continuing. It can best be understood as a process, not an event. In

seeking to advance the process of equal justice before the law, it is essential that we understand the persistent character of racial discrimination and its evolving nature. We must recognize that although overt racial bias is, in most quarters, in retreat, the problem of implicit bias poses a major challenge and must be addressed. Finally, because of the intractable and evolving nature of racial bias, we must adopt a pragmatic and flexible approach to sculpting appropriate judicial remedies to meet the challenge.

**B. Systematic Review of the Jury Process.** Given the above history of the persistent and evolving nature of the struggle for racial equality, it is not surprising that the effort to promote equal justice under the law in law enforcement and in our judicial system has been persistent and evolving too. By way of example, although the United States Supreme Court in *Strauder v. West Virginia*, 100 U.S. 303, 308–09 (1879), *abrogated on other grounds by Taylor v. Louisiana*, 419 U.S. 522, 536–37, & n.19, 95 S. Ct. 692, 700–01 & n.19 (1975), declared that African-Americans could not be disqualified as jurors, experience showed that *Strauder* was unenforced if not unenforceable. Decades later, the United States Supreme Court advanced beyond *Strauder* in *Swain v. Alabama*, 380 U.S. 202, 226, 85 S. Ct. 824, 839 (1965). Yet, *Swain* proved inadequate to the task as well, and was overruled twenty years later in *Batson v. Kentucky*, 476 U.S. 79, 96, 106 S. Ct. 1712, 1723 (1986). And today, scholars believe we need to move beyond *Batson* in advancing the notion of "equality before the law" for African-Americans. *See, e.g.*, Jeffrey Bellin & Junichi P. Semitsu, *Widening* Batson*'s Net to Ensnare More Than the Unapologetically Bigoted or Painfully Unimaginative Attorney*, 96 Cornell L. Rev. 1075, 1108 (2011) [hereinafter Bellin & Semitsu] (stating further measures must be taken to guard against discrimination in the courts because "*Batson*

cannot be expected to have anything but the most superficial success in rooting out unconstitutional race- or gender-based peremptory challenges"). If anything, our civil rights experience suggests that, particularly when it comes to remedies, judicial approaches should not be cast in stone but should be shaped and sculpted in light of experience arising from their application.

When we approach a case with civil rights implications, it is important to think systemically. Important issues involving the make-up of the venire pool, the scope of voir dire of potential jurors, the use of peremptory challenges, and the instructions given to the jury intersect and act together to promote, or resist, our efforts to provide all defendants with a fair trial. *See* Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, the Failed Promise of* Batson, *and Proposed Solutions*, 4 Harv. L. & Pol'y Rev. 149, 168 (2010) [hereinafter Bennett] (discussing tandem remedies).

For instance, today we have announced a new approach designed to ensure that the jury pools in our judicial system represent a fair cross section of the community. These cases reflect a significant, and necessary, step in vindicating the right of citizens to a fair and impartial jury. I applaud the court for its approach to fair-cross-section requirements. My view on this issue is further stated in *State v. Lilly*, ___ N.W.2d ___, ___ (Iowa 2019) (Appel, J., concurring specially).

But the advances reflected in our approach to fair-cross-section requirements will be meaningless if a party is able to exercise peremptory challenges in a fashion that eliminates the few African-Americans who are on the pool or venire from the petit jury. *See Swain*, 380 U.S. at 241 (Goldberg, J., dissenting) (noting the interlocking relationship between an inadequate venire selection system and the use of peremptory challenges).

In Iowa, the minority population is sufficiently small that few African-Americans are likely to be in the venire pool even with the more generous approach to fair-cross-section challenges commendably embraced in our cases decided today. *See Plain*, 898 N.W.2d at 830 (noting that black people comprise a small percentage of Iowa's population). It will do little to advance the cause of impartial juries if the preliminary jury pool is more representative of the community but all minority members are routinely eliminated from the jury that actually sits.

Further, if our process is such that it yields few African-American venire jurors and fewer still African-American petit jurors, we cannot rely on fair-cross-section- or *Batson*-type concepts as the only tools to eliminate racial bias in our jury system. Bennett, 4 Harv. L. & Pol'y Rev. at 168. The importance of voir dire and jury instructions as tools to eliminate or reduce the influence of racial bias in our system proportionately increases as the proportion of African-American or other minorities on the petit jury decreases. *See id.*

The degree to which voir dire is effective in rooting out racial prejudice has been debated by scholars. *Compare* Jeffrey M. Gaba, *Voir Dire of Jurors: Constitutional Limits to the Right of Inquiry into Prejudice*, 48 U. Colo. L. Rev. 525, 533–34 (1977) ("While *voir dire* may not be completely effective in discovering prejudice, there are additional objectives, both proper and improper, which it serves. Furthermore, it is still the primary mechanism by which prejudicial attitudes are revealed and is thus an essential—if imperfect—element of the challenge system."(Footnotes omitted.)), *with* Valerie P. Hans & Alayna Jehle, *Avoid Bald Men and People with Green Socks? Other Ways to Improve the Voir Dire Process in Jury Selection*, 78 Chi.-Kent L. Rev. 1179, 1179 (2003) ("[V]oir dire is often ineffective in detecting juror bias . . . ."). I suspect the batting average may

not be very high. But while many overtly or implicitly biased jurors may not be identified in the voir dire process, some plainly are. The fact that voir dire is not 100% effective, or even 50% effective, in identifying biased jurors does not mean it should be abandoned, but only that we should maximize its effectiveness and develop other tools to back it up. For example, it is clear that voir dire's effectiveness in rooting our racial prejudice is maximized by eliminating reliance on judge-directed, closed-end "yes" or "no" questions that almost universally produce compliant answers. *See* Anne M. Payne & Christine Cohoe, Annotation, *Jury Selection and Voir Dire in Criminal Cases*, 76 Am. Jur. Trials 127, § 56, Westlaw (database updated May 2019.) ("It is wise for counsel to avoid asking questions of prospective jurors during voir dire which can be answered either yes or no."). Instead, we should permit attorneys to engage in individual, open-ended examination of jurors designed to allow the juror to speak about his or her cultural attitudes. *Id.* § 23 ("An open-ended question permits each juror to explain his answer in his own words through his own thoughts."). With this approach, voir dire is not remotely perfected, but it is somewhat enhanced, as a tool to explore potential bias.

On the very back end of the jury process, the United States Supreme Court, following the lead of many state courts, has opened the door to exploration of jury deliberation where the process is tainted by egregious and overt racial discrimination. *See Peña-Rodriguez v. Colorado*, 580 U.S. ___, ___, 137 S. Ct. 855, 869 (2017). This remedy, however, has been very narrowly crafted. It amounts to a last ditch backstop for the worst of cases that come to the attention of the court.

In short, because of the limited number of African-American jurors who will make it to the jury pool, the possibility that *Batson* strikes will eliminate them from the petit jury, and the helpful but limited effectiveness

of voir dire as an antibias tool, the court's instructions to the jury may be the last, best line of defense against racial bias in our jury system. This is particularly true with respect to implicit bias. Studies show that identifying and discussing the possibility of unconscious racial bias can be effective in minimizing or eliminating it. Cynthia Lee, *A New Approach to Voir Dire on Racial Bias*, 5 U.C. Irvine L. Rev. 843, 872 (2015). An implicit-bias instruction, therefore, should play a part in our effort to ensure that equality before the law is a reality for African-Americans and other minorities in our jury system. I further discuss these issues in *State v. Williams*, ___ N.W.2d ___, ___ (Iowa 2019) (Appel, J., concurring in part and dissenting in part).

**C. Role for State Courts.** Finally, I want to emphasize the important role of state courts in addressing the continuing challenge of bringing us closer to the goal of racial equality in our courts. Obviously, the Iowa Constitution and our supervisory authority over Iowa courts provides an independent basis for addressing fundamental issues such as the rights to an impartial jury and to equality before the law. *See* Iowa Const. art. I, §§ 1, 6, 9, 10.

But it is also important to note the vibrant constitutional dialogue that arises when state courts engage in independent constitutional analysis. Throughout our constitutional history, state court decisions have been precursors to later developments in federal law. We all know about how the Iowa Civil Rights cases provided an example for later federal constitutional adjudication. *See, e.g.,* Lovell, 67 Drake L. Rev. at 189. There are other, more recent examples of state courts leading the way. For instance, in 1948, the California Supreme Court in *Perez v. Lippold*, 198 P.2d 17, 29 (Cal. 1948) (en banc), struck down a state statute invalidating interracial marriages. *Perez* laid the groundwork for the pivotal United

States Supreme Court case, twenty years later, of *Loving v. Virginia*, 388 U.S. 1, 2, 87 S. Ct. 1817, 1818–19 (1967). Similarly, after *Swain*, state courts rejected the high burdens imposed on those challenging racially tinged peremptory challenges. For instance, in *People v. Wheeler*, 583 P.2d 748, 765–67 (Cal. 1978), *overruled in part on other grounds by Johnson v. California*, 545 U.S. 162, 164, 173, 125 S. Ct. 2410, 2414, 2419 (2005), the California Supreme Court, relying on state constitutional provisions resembling Iowa's, specifically rejected *Swain* and developed a far more workable framework for dealing with racially discriminatory strikes. So did Massachusetts. *See Commonwealth v. Soares*, 387 N.E.2d 499, 509–16 (Mass. 1979). So did Florida. *See State v. Neil*, 457 So. 2d 481, 485–87 (Fla. 1984), *receded from in part by State v. Johans*, 613 So. 2d 1319, 1321 (Fla. 1993). So did New Mexico. *See State v. Crespin*, 612 P.2d 716, 717–18 (N.M. Ct. App. 1980). These cases, all cited later by the United States Supreme Court in *Batson*, blazed the way for the further development of federal constitutional law. 476 U.S. at 82 n.1, 106 S. Ct. at 1715 n.1. And, after *Batson*, a number of state supreme courts extended the *Batson* rule to cover gender under their own state constitutions. *See, e.g., State v. Levinson*, 795 P.2d 845, 849–50 (Haw. 1990); *Commonwealth v. Hyatt*, 568 N.E.2d 1148, 1150 (Mass. 1991); *State v. Gonzales*, 808 P.2d 40, 49–50 (N.M. Ct. App. 1991). The United States Supreme Court later followed suit. *J.E.B. v. Ala. ex rel. T.B.*, 511 U.S. 127, 128–29, 114 S. Ct. 1419, 1421 (1994).

The recent Supreme Court case of *Peña-Rodriguez* demonstrates the important role of state courts in developing legal doctrine on the federal level. 580 U.S. at ___, 137 S. Ct. at 865. In its decision, the Supreme Court in noted that sixteen states had developed exceptions to their no-

impeachment-of-jury-verdict rules in cases involving explicit racial bias in jury deliberations. *Id.*

The unmistakable point is that vibrant, independent state constitutional law has enriched the development not only of the law in each state, but has promoted the development of federal constitutional law as well.

## II. Challenge Based on Fair Cross Section.

For the reasons expressed in my concurring opinion in *Lilly*, I am not convinced that the sole test for the second *Duren* and *Plain* prong should always be one standard deviation. *Lilly,* ___ N.W.2d at ___; *see Duren v. Missouri,* 439 U.S. 357, 364, 99 S. Ct. 664, 668 (1979); *Plain,* 898 N.W.2d at 826–27. Yet, as indicated there, I think that using a relatively low statistical deviation threshold may be sufficient to avoid the pitfalls of the application of the statistical method. The step forward on the fair-cross-section issue, however, will be meaningless if prosecutors use peremptory strikes to eliminate minority jurors and if we fail to take other effective steps to combat racial bias in our court system.

## III. Challenge to Peremptory Strike of the Last African-American Member of a Venire Pool.

In addition to the fair-cross-section issue, this case involves another important issue, namely, a challenge to the prosecution's use of a peremptory challenge to eliminate the last African-American from the jury pool. In defending the strike, the prosecutor explained that he had personally prosecuted the juror's father for three class A felonies and feared that the potential juror harbored "latent hostility" toward him as a result. The potential juror, however, stated that she was not close to her father, that the situation would have no effect on her ability to be an impartial juror, that her father was treated fairly by the state, that she

would not hold the prosecution of her father against the state, that she did not recognize the prosecutor as someone involved in the prosecution until the prosecutor brought it up, and that she had no relationship with her father in any event. The district court found no *Batson* violation.

Veal argues that the voir dire of the juror negated any legitimate concern that the prosecutor might have had about latent hostility towards him, and as a result, he showed pretext under *Batson*. If we were to find the State's exercise of its peremptory challenge of the last African-American on the jury panel under the circumstances satisfies *Batson*, however, Veal urges us to reconsider the application of *Batson* in the circumstances of this case where the last potential African-American juror is stricken from the jury pool. According to Veal, the court should hold the State to a "very high standard" in these circumstances.

Citing an unpublished court of appeals opinion, Veal asserts that the prosecutor's "reasoning seems to fit into that category of facially non-discriminatory reasoning that disproportionately implicates African-American potential jurors." *State v. Miller*, No. 16-0331, 2017 WL 1088104, at *3 (Iowa Ct. App. Mar. 22, 2017). Veal incorporates at length the court of appeals discussion, which I reproduce below, of a scholarly article and a dissenting opinion by Justice Stevens:

> "A significantly higher percentage of people of color have arrest records due to the disproportionate number of stops, searches, and arrests of people of color." Vida B. Johnson, *Arresting* Batson*: How Striking Jurors Based on Arrest Records Violates* Batson, 34 Yale L. & Pol'y Rev. 387, 389 (Spring 2016). Additionally, "Black people are more likely to have friends and family who are Black. As a result, Black jurors are more likely than White jurors to have friends and family who have been arrested." *Id.* The logical next step is that someone who has been arrested themselves or had someone they care about be arrested is more likely to have negative views of law enforcement. *Id.* at 407. While using potential jurors' response about law enforcement appears to be race-neutral, it is likely to have a disparate impact on potential

black jurors. *See id.* at 389 ("Judges and prosecutors then use the existence of prior arrests of the jurors or the jurors' friends or family to strike these prospective jurors, in effect producing juries whose racial compositions are whiter than that of the respective communities."); *see also Hernandez v. New York*, 500 U.S. 352, 376[, 111 S. Ct. 1859, 1875] (1991) (Stevens, J., dissenting) ("An avowed justification that has a significant disproportionate impact will rarely qualify as a legitimate, race-neutral reason sufficient to rebut the prima facie case because disparate impact is itself evidence of discriminatory purpose.").

*Id.* Based on the above reasons, Veal asserts that the trial court should have sustained the *Batson* challenge and requests a new trial as a result of the error.

The NAACP has filed an amicus brief in support of Veal challenging the continued viability of *Batson.* The NAACP notes that in *Foster v. Chatman*, 578 U.S. ___, ___, 136 S. Ct. 1737, 1754–55 (2016), the Supreme Court required trial courts to engage in a searching inquiry of the prosecutor's demeanor and stated justifications for striking jurors of color, including a comparative juror analysis to determine whether the stated race-neutral reasons for striking black jurors were in fact even-handedly applied to white jurors. Further, in *Peña-Rodriguez*, 580 U.S. at ___, 137 S. Ct. at 868–69, the NAACP points out that the Supreme Court noted that racially biased comments in jury deliberations could require the trial court to overturn a jury verdict.

In addition, the NAACP cites cases from Washington State as providing a better approach. *See City of Seattle v. Erickson*, 398 P.3d 1124, 1127–31 (Wash. 2017); *State v. Saintcalle*, 309 P.3d 326, 333–39 (Wash. 2013) (en banc) (plurality opinion). In these cases, the Washington Supreme Court extensively canvased the shortcomings of *Batson* jurisprudence and proposed changes in the judicial approach to eliminating racial discrimination in the selection of jurors. *Erickson*, 398

P.3d at 1127–31; *Saintcalle*, 309 P.3d at 333–39. The NAACP suggests that there is a growing national consensus that the procedural protections in *Batson* simply do not work. The NAACP cites a symposium that appeared in the Iowa Law Review in 2012 on *Batson*. *See* Symposium, Batson *at Twenty Five: Perspectives on the Landmark, Reflections on Its Legacy*, 97 Iowa L. Rev. 1393 (2012).

On appeal, the State opposes Veal's *Batson* challenge. The State asserts that the prosecutor in this case presented a nondiscriminatory reason for the peremptory strike. While the State recognizes that generalized reasons for striking African-Americans from juries might be more problematic, the State points out that in this case, the prosecution had a specific reason tied to the case at hand, namely, that the prosecutor had tried the father of the prospective juror on a class A felony. Further, the State rejects the notion that the juror was rehabilitated, noting that "neutral answers can still conceal deep, unconscious bias." The State urges that we give "great deference" to the trial court's finding crediting the prosecution's reason for striking the juror as race neutral.

**A. The Road to *Batson* and Beyond.**

1. *Introduction.* This case involves both state and federal constitutional questions. In order to illuminate the choices presented in this case, a survey of how the United States Supreme Court has grappled with the issue provides context. In addition, exploration of dissents gives texture to the issues and may recommend to us alternative approaches.

2. *From* Strauder *to* Swain. After the Civil War and the passage of the Reconstruction Amendments, the United States Supreme Court, at least in theory, sought to protect the right of African-Americans to serve on juries. The first major case was *Strauder*, 100 U.S. 303. In *Strauder*, the Supreme Court considered the validity of a West Virginia statute that

excluded African-Americans from jury service. *Id.* at 304. The *Strauder* Court held that the practice violated the Fourteenth Amendment. *Id.* at 310.

The *Strauder* Court recognized the importance of having representation of the unpopular on the jury. According to the *Strauder* Court, the rights associated with jury trials were designed "to make impossible what Mr. Bentham called 'packing juries.' " *Id.* at 309. Further, the *Strauder* Court declared,

> It is well known that prejudices often exist against particular classes in the community, which sway the judgment of jurors, and which, therefore, operate in some cases to deny to persons of those classes the full enjoyment of that protection which others enjoy.

*Id.*

Yet the *Strauder* Court emphasized that the question was not whether a defendant had a right to "a petit jury composed in whole or in part of persons of his own race." *Id.* at 305. The question was whether all members of a race may be excluded from the jury by law. *Id.*

Experience, however, showed *Strauder* was ineffective. *Strauder* made clear, of course, that statutes expressly prohibiting African-Americans from serving on juries would not pass constitutional muster. *Id.* at 304. In at least two cases, the United States Supreme Court ventured beyond the four corners of *Strauder* to invalidate convictions of all white juries where the right of African-Americans to serve on the juries, though not categorically denied by statute, was "denied in substance and effect." *Norris v. Alabama*, 294 U.S. 587, 590, 597–98, 55 S. Ct. 579, 580, 583–84 (1935) (noting that no witness could recall an African-American ever serving on a jury); *see also Hill v. Texas*, 316 U.S. 400, 401–02, 404, 62 S. Ct. 1159, 1160–61 (1942) (observing that commissioners with

discretion "consciously omitted to place" any African-Americans on jury list).

But these prohibitions proved easy to avoid by erecting less absolute, but nonetheless effective, informal obstacles to prevent African-American jury service, including the use of peremptory challenges to eliminate African-Americans from the jury box. By 1961, the United States Commission on Civil Rights observed that "[t]he practice of racial exclusion from juries persists today even though it has long stood indicted as a serious violation of the 14th [A]mendment." *Swain*, 380 U.S. at 231, 85 S. Ct. at 842 (first alteration in original) (quoting U.S. Comm'n on Civil Rights, *Justice* 103 (1961)).

The informal obstacles to African-Americans serving on juries were evident in *Swain*. In *Swain,* a 19 year-old African-American was convicted of raping a seventeen-year-old white girl and sentenced to death. *Id.* African-Americans had been on the venire, but none had sat on a petit jury in the county for fifteen years. *Id.* at 205, 85 S. Ct. at 828 (majority opinion). Swain claimed a violation of the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 203–04, 85 S. Ct. at 826.

The *Swain* majority rejected his challenge. The *Swain* majority emphasized that an African-American is not entitled to a proportionate number of his race on the jury. *Id.* at 208, 85 S. Ct. at 829. Although *Swain* stated that systematic exclusion of African-Americans from the jury might violate the Fourteenth Amendment, the *Swain* majority concluded that such systematic exclusion was not shown in the case. *See id.* at 226–27, 85 S. Ct. at 839. The *Swain* majority recognized that African-Americans had not served on petit juries in fifteen years but concluded that the record was insufficient to show that the exclusion of African-

Americans from the petit juries was due to the prosecutor alone. *Id.* at 226–28, 85 S. Ct. at 839–40.

In support of its conclusion, the *Swain* Court cited parts of the record showing that defense lawyers may have sometimes participated in the striking of African-American jurors. *Id.* at 225 & n.31, 85 S. Ct. at 838 & n.31. Thus, although no African-American juror had ever served on a petit jury in the county in fifteen years, the *Swain* majority reasoned that that was not necessarily due to systematic use of peremptory challenges by the prosecutions. *Id.* at 225–26, 85 S. Ct. at 838–39. The *Swain* majority emphasized the requirement of "purposeful or deliberate denial" of the right of African-Americans to participate as jurors. *Id.* at 203–04, 85 S. Ct. at 826. Anything short of systematic purposeful or deliberate denial "in case after case" by the prosecution did not affront the Equal Protection Clause. *Id.* at 223, 85 S. Ct. at 837.

Justice Goldberg, joined by Chief Justice Warren and Justice Douglas, dissented. *Id.* at 228, 85 S. Ct. at 840 (Goldberg, J., dissenting). Justice Goldberg wrote it was undisputed that no African-American had sat on a petit jury in the county "within the memory of persons [then] living." *Id.* at 231–32, 85 S. Ct. at 842. He wrote that "[t]he very point" of the court's prior cases was to prevent deliberate and systematic exclusion of African-Americans "not merely from being placed upon the panel, but from serving on the jury." *Id.* at 239, 85 S. Ct. at 846. Further, Justice Goldberg wrote that the majority overlooks that the exclusion of African-American jurors in the county "results from the interlocking of an inadequate venire selection system . . . and the use of peremptory challenges." *Id.* at 241, 85 S. Ct. at 847.

3. *Post*-Swain *independent state constitutional law development.* After *Swain,* a number of state courts rejected its limitations under their

state constitutions. In *Wheeler*, the California Supreme Court considered the question of peremptory challenges based on race under Article I, section 16 of the California Constitution. 583 P.2d at 754. The *Wheeler* court declared that if a defendant made a prima facie showing of discrimination based on race, the burden of justification would then shift to the prosecution that the strike was not based on group bias alone. *Id.* at 764–65. If the prosecution's justification is not sustained, the jury would fail to comply with the fair-cross-section requirements of the California Constitution. *Id.* at 765.

Notably, the *Wheeler* court recognized that *Swain* provided less protection. *Id.* at 767. The *Wheeler* court concluded that under *Swain* it was practically impossible for a defendant to show systematic exclusion of a racial group across multiple juries as a result of cost and lack of information. *Id.* 767–68. The court also noted that "each and every defendant not merely the last in this artificial sequence is constitutionally entitled to trial by a jury drawn from a representative cross-section of the community." *Id.* at 767. The *Wheeler* court cited an annotation and its own experience for the proposition that since *Swain*, no defendant had succeeded in applying the test. *Id.* at 768. Noting that "[i]t demeans the Constitution to declare a fundamental personal right under that charter and at the same time make it virtually impossible for an aggrieved citizen to exercise that right," the *Wheeler* court declared that the rule of *Swain* was not to be followed in California courts. *Id.* State appellate courts in several other jurisdictions came to essentially the same conclusions under the jury trial rights established in their state constitutions. *See, e.g., Neil*, 457 So. 2d at 485; *Soares*, 387 N.E.2d at 509–16.

4. *Taking the hint: Abandonment of* Swain *for* Batson. Spurred by state court constitutional precedent, the Supreme Court reconsidered

*Swain* in *Batson*, 476 U.S. at 82, 106 S. Ct. at 1714–15.  In *Batson*, the African-American defendant had been indicted on charges of second-degree burglary and receipt of stolen goods.  *Id.* at 82, 106 S. Ct. at 1715.  The prosecutor used peremptory challenges to remove all four African-Americans on the venire.  *Id.* at 83, 106 S. Ct. at 1715.  Writing for the majority, Justice Powell stated that the case required reexamination of the holding in *Swain* concerning the evidentiary burden placed on a criminal defendant who claims an equal protection violation due to the state's use of peremptory challenges to exclude African-Americans from the petit jury.  *Id.* at 90, 106 S. Ct. at 1719.

Largely following contemporaneous state supreme court precedent, the United States Supreme Court departed from the "crippling burden" of *Swain* and adopted a three-step approach to claims of racial discrimination in the exercise of peremptory challenges.  *Id.* at 92–94, 106 S. Ct. at 1721.  Under *Batson*, the defendant first must make a prima facie case of purposeful discrimination.  *Id.* at 93–94, 106 S. Ct. at 1721.  If the defendant presents a prima facie case, the burden then shifts to the state to articulate a racially neutral basis for the strike.  *Id.* at 94, 106 S. Ct. at 1721.  If the state articulates a racially neutral reason, the court must then decide whether the articulated reason is pretextual.  *Johnson*, 545 U.S. at 168, 125 S. Ct. at 2416.

Justice Marshall applauded the ruling but feared it would prove unworkable.  *Batson*, 476 U.S. at 102–03, 106 S. Ct. at 1726 (Marshall, J., concurring).  In a prescient opinion, Justice Marshall noted that any prosecutor could easily assert facially neutral reasons for striking a juror and that courts would be hard-pressed to second guess the judgment.  *Id.* at 106, 106 S. Ct. at 1728.  Justice Marshall noted apparently neutral " 'seat-of-the-pants instincts' may often be just another term for racial

prejudice." *Id.* Justice Marshall concluded that the only way to accomplish the goal of eliminating racial discrimination in peremptory challenges was to eliminate them completely. *Id.* at 107, 106 S. Ct. at 1728–29.

5. *Post-*Batson *Supreme Court developments limiting (and expanding?)* Batson*.* After *Batson,* the Supreme Court decided a number of cases that affected the importance of the decision. In *Holland v. Illinois,* 493 U.S. 474, 478, 110 S. Ct. 803, 806 (1990), in a divided 5–4 majority opinion, Justice Scalia remarkably concluded that a prosecutor's use of peremptory challenges to eliminate a distinctive group in the community does not deprive a defendant of a Sixth Amendment right. Further, in *Hernandez,* 500 U.S. at 360, 111 S. Ct. at 1867 (plurality opinion), in another divided opinion, Justice Kennedy wrote for a plurality that peremptory strikes against Hispanic jurors—made on the asserted ground that they might not accept the court's translator as the official record of the proceedings—was not invalid notwithstanding the disproportionate impact of the strikes on the jury.

A remarkable opinion, *Purkett v. Elem,* 514 U.S. 765, 769, 115 S. Ct. 1769, 1771 (1995) (per curiam), gave no encouragement to those who wanted *Batson* to have "teeth." In this case, the prosecutor explained that he struck two African-American juror because of their facial hair. *Id.* The per curiam opinion emphasized that the facial hair issue was race neutral and satisfied step two of the *Batson* formula. *Id.* The Court emphasized that the asserted race-neutral reason did not need to be even minimally persuasive or plausible. *Id.* at 768–69, 115 S. Ct. at 1771. The per curiam opinion stressed that a trial court judge must first make the determination as to whether the asserted reason was pretext, and that such a determination would be presumed correct and reversed only if not fairly

supported by the record. *Id.* at 769, 115 S. Ct. at 1771. In dissent, Justice Stevens, joined by Justice Breyer, stated that it was not too much to require that the prosecutor's purported neutral reason be *trial related*. *Id.* at 775, 115 S. Ct. at 1774 (Stevens, J., dissenting).

Yet the ability to prove a *Batson* violation was not impossible. In *Miller-El v. Dretke*, 545 U.S. 231, 235–36, 125 S. Ct. 2317, 2322 (2005), in another divided decision so characteristic of *Batson* progeny, Justice Souter for a six-member majority reversed a state court determination that the striking of ten out of eleven black venire persons by a prosecutor from the notorious Dallas County District Attorney's office was not racially motivated.

Justice Souter began by noting that the test developed in *Swain* requiring an extended pattern of discrimination left a prosecutor's use of peremptory challenges "largely immune from constitutional scrutiny." *Id.* at 239, 125 S. Ct. at 2324 (quoting *Batson*, 476 U.S. at 92–93, 106 S. Ct. at 1721). But *Batson*, Justice Souter wrote, had a weakness of its own, namely, that although focus on the strikes in an individual trial might be theoretically sufficient, a *Batson* violation might nonetheless be hard to prove to the satisfaction of a wavering court without systemic discrimination. *See id.* at 239–40, 125 S. Ct. at 2325.

Justice Souter chopped and diced the evidence. He generally noted that the prosecution used its peremptory strikes to exclude 91% of the eligible African-American venire members from the jury pool. *Id.* at 240–41, 125 S. Ct. at 2325. But mostly, Justice Souter examined the side-by-side comparisons of some black panelists who were struck and white panelists allowed to serve. *Id.* at 241–51, 125 S. Ct. at 2325–31. For example, Justice Souter noted that one African-American potential juror was struck because the prosecutor inaccurately characterized his views

on the death penalty and religion, even as white potential jurors who expressed reservations about imposing the death penalty were not struck. *Id.* at 243–45, 125 S. Ct. at 2327–28. With respect to another potential juror, Justice Souter also noted shifting explanations by the state to defend one of its peremptory strikes which, according to Justice Souter, "reeks of afterthought." *Id.* at 246, 125 S. Ct. at 2328. With respect to a third juror, Justice Souter found that while the purported reason for striking the African-American juror for her views on the death penalty seemed reasonable on its face, the purported reason was severely undercut by the prosecution's failure to object to other jurors who gave similar answers. *Id.* at 248, 125 S. Ct. at 2329–30.

In addition, Justice Souter noted that the prosecution engaged in a jury shuffle—literally a shuffling of cards representing jurors—whenever African-American jurors tended to be in the front rows of the venire panel and thus more likely to be picked for the jury than those seated at back. *Id.* at 253–54, 125 S. Ct. at 2332–33. Further, Justice Souter noted that graphic scripts related to the death penalty were read to African-American venire members, while bland descriptions were read to white prospective jurors. *Id.* at 255–56, 125 S. Ct. at 2333–34.

Finally, Justice Souter cited the history of the Dallas County District Attorney's office. *Id.* at 263–64, 125 S. Ct. at 2338–39. That history showed prosecutors marked the race of each potential juror on their juror cards and a manual, written in 1968 yet available to one of the prosecutors in *Miller-El*, outlined the reasons for striking African-American jurors. *Id.* at 264, 125 S. Ct. at 2339.

Even with all the evidence, Justice Thomas, joined by Chief Justice Rehnquist and Justice Scalia, dissented. *Id.* at 274, 125 S. Ct. at 2344 (Thomas, J., dissenting). Among other things, the dissent emphasized that

Justice Souter relied on evidence such as juror questionnaires and juror cards that were not provided to the Texas courts. *Id.* at 279, 125 S. Ct. at 2347. Justice Thomas further found, among other things, that the majority misread the voir dire transcripts, utilized claims of disparate questioning that did not fit the facts, and engaged in pure speculation about the jury shuffles. *Id.* at 286, 296, 304, 125 S. Ct. at 2351, 2357, 2361–62.

Justice Breyer concurred. *Id.* at 266, 125 S. Ct. at 2340 (Breyer, J., concurring). But he took up the mantle of Justice Marshall in his *Batson* dissent. *Id.* at 266–67, 125 S. Ct. at 2340. Justice Breyer noted that in this case, twenty-three judges reviewed the matter, with six finding a violation of *Batson* and sixteen to the contrary. *Id.* at 267, 125 S. Ct. at 2340. He noted that judges are put in the awkward, and sometimes hopeless, task of second guessing a prosecutor's judgments. *Id.* at 267, 125 S. Ct. at 2341. According to Justice Breyer, it becomes impossible for a judge to distinguish between a " 'seat-of-the-pants' peremptory challenge" and " 'seat-of-the-pants' racial stereotype." *Id.* at 268, 125 S. Ct. at 2341. Justice Breyer extensively cited studies tending to show that *Batson* had not been successful in rooting out racial stereotyping in the use of peremptory challenges. *Id.* at 268–69, 125 S. Ct. at 2341–42. Justice Breyer also observed that "the law's antidiscrimination command and a peremptory jury-selection system that permits or encourages the use of stereotypes work at cross-purposes." *Id.* at 271–72, 125 S. Ct. at 2343. Justice Breyer concluded that the case demonstrated the need to reconsider *Batson*'s test and the peremptory challenge system as a whole. *Id.* at 272–73, 125 S. Ct. at 2343–44.

Yet another *Batson* case, *Felkner v. Jackson*, 562 U.S. 594, 131 S. Ct. 1305 (2011) (per curiam), gives one pause. One potential juror in

this case was an African-American who stated that he had been stopped by police numerous times. *Id.* at 595, 131 S. Ct. at 1306. The prosecutor exercised a peremptory challenge, fearing the potential juror would not be favorable to law enforcement. *Id.* Of course, the experience of "Driving While Black" is common among African-Americans. *See* David A. Harris, *The Stories, The Statistics, and the Law: Why "Driving While Black" Matters*, 84 Minn. L. Rev. 265, 266 (1999). Yet the Supreme Court upheld the challenge in a per curiam opinion. *Felkner*, 562 U.S. at 598, 131 S. Ct. at 1307. The *Felkner* result suggests that any young African-American male who has been stopped by police is subject to exclusion from the jury.

Finally, I consider the recent Supreme Court case of *Foster*, 578 U.S. ___, 136 S. Ct. 1737. In *Foster*, the defendant had been convicted of murder and sentenced to death thirty years before the appeal. *Id.* at ___, 136 S. Ct. at 1742–43. He claimed that the prosecution violated *Batson* in the exercise of peremptory strikes at trial. *Id.* at ___, 136 S. Ct. at 1742. After the Georgia courts denied relief, the Supreme Court granted certiorari. *Id.* at ___, 136 S. Ct. at 1742–43.

Interestingly, after his conviction, Foster was able to obtain 103 pages of the prosecution's file under the Georgia Open Records Act. *Id.* at ___, ___, 136 S. Ct. at 1743–44, 1747. Documents in the file, not available to the defense at time of trial, revealed numerous racial references. *Id.* An "N" appeared before the name of each African-American juror, and a list of jurors to be stricken listed all five African-Americans at the top. *Id.*

In an opinion by Chief Justice Roberts, the *Foster* Court found the strikes of two African-American jurors were pretextual. *Id.* at ___, 136 S. Ct. at 1754–55. The *Foster* Court engaged in extensive comparative analysis of the questions and responses of white and African-American jurors. *Id.* at ___, 136 S. Ct. at 1748–55. The *Foster* Court concluded that

the asserted neutral reasons were contradicted by the record or difficult to accept because white jurors with the same traits or answers were accepted by the prosecution. *Id.* at ___, 136 S. Ct. at 1754. The *Foster* Court further relied on the "definite NO" list, the first five names of which were African-American and all of whom were struck but one who was excused for cause. *Id.* at ___, 136 S. Ct. at 1755.

Justice Thomas dissented. *Id.* at ___, 136 S. Ct. at 1761 (Thomas, J., dissenting). Aside from a jurisdictional issue, Justice Thomas questioned the use of information on the voir dire process obtained by Foster years after his conviction. *Id.* According to Justice Thomas, the uncovering of new evidence does not justify upending the deferential *Batson* framework. *Id.* at ___, 136 S. Ct. at 1766. Aside from the use of new evidence, Justice Thomas believed the Court should defer to the courts in Georgia who had the opportunity to conduct their own comparative analysis and make their own credibility determinations. *Id.* at ___, 136 S. Ct. at 1767–69.

### B. State Court Responses to *Batson.*

1. *Revising* Batson*: Eliminating step one.* What constitutes a prima facie case under step one of *Batson* has confused the courts and commentators. Several states have decided to eliminate step one altogether. For instance, in *Johans*, 613 So. 2d at 1321–22, the Florida Supreme Court eliminated the first prong of the *Batson* inquiry under Florida law. All that was required was that the person eliminated from the jury be a member of a minority group. *See id.* The Connecticut Supreme Court took a similar step in *State v. King*, 735 A.2d 267, 279 & n.18 (Conn. 1999). In *State v. Daniels*, 122 P.3d 796, 800 (Haw. 2005), the Hawaii Supreme Court held that a prima facie case of discriminatory purpose is automatically established "if the effect of the prosecution's exercise of its

peremptory challenges is to exclude from the jury all members of the same protected group as the defendant, and the defense raises a *Batson* challenge." *Id.* The departure from the *Batson* framework in these cases is not revolutionary but demonstrates the ability of state supreme courts to exercise their own pragmatic judgment under state law when dealing with the question of peremptory strikes.

2. *Strengthening* Batson *(*Batson *with teeth).* Another state court reformist approach to *Batson* is reflected in cases that employ what might be referred to colloquially as "*Batson* with teeth." These cases tend to focus on the second prong of *Batson* and seek to be at least somewhat more demanding on what the state must show to demonstrate a racially neutral basis for a strike.

For instance, in *Ex Parte Bruner*, 681 So. 2d 173, 176 (Ala. 1996), the Alabama Supreme Court followed a "quasi-*Batson*" approach. When a movant meets the first prong of *Batson*, the state must "articulat[e] a clear, specific, and legitimate reason for the challenge which relates to *the particular case to be tried*, and which is nondiscriminatory." *Id.* at 178–79 (alteration in original) (quoting *Ex parte Branch*, 526 So. 2d 609, 623 (Ala. 1987)).

Similarly, the Florida Supreme Court has emphasized that, under the second prong of its approach to *Batson*, the prosecution must identify a "clear and reasonably specific" race-neutral explanation that is related to the trial at hand. *Spencer v. State*, 238 So. 3d 708, 712 (Fla. 2018) (quoting *State v. Slappy*, 522 So. 2d 18, 22 (Fla. 1988), *receded from in part by Melbourne v. State*, 679 So. 2d 759, 764–65 (Fla. 1996)).

A substantial number of commentators seek to work within the *Batson* framework but provide greater potential for effective enforcement. *See* Bellin & Semitsu, 96 Cornell L. Rev. at 1121–25 (suggesting higher

standard of proof to rebut discriminatory motive without requiring finding of pretext); Camille A. Nelson, Batson*, O.J., and* Snyder*: Lessons from an Intersecting Trilogy*, 93 Iowa L. Rev. 1687, 1703 (2008) (arguing *Batson* challenge should be sustained where evidence "fits" racial motivation more easily than race-neutral reason).

3. *Reconsidering* Batson*: State of Washington.* The Supreme Court of Washington has addressed *Batson* jurisprudence recently in three important cases. These cases thoroughly highlight the pressure points in current *Batson* jurisprudence. In addition, the Washington court has now promulgated a rule revamping how *Batson*-type challenges will be treated in state court. The Washington experience suggests that *Batson* jurisprudence may be on the verge of reformulation in state courts.

The first case, *Saintcalle*, 309 P.3d at 329, involved a challenge to a conviction of first-degree felony murder because the prosecution struck the only black venire person from the jury pool. The potential juror in *Saintcalle* knew someone who had recently been murdered. *Id.* at 331. When asked how she would feel about sitting on a murder trial, the juror told the lawyers, "I don't know how I'm going to react." *Id.* The prosecution exercised a peremptory strike on the ground that there was a realistic possibility that the juror might be "lost" at the end of the trial. *See id.* at 340. The district court observed the juror and agreed that she was having difficulties and that the prosecution's strike was legitimate and race neutral. *Id.*

Over a dissent, the *Saintcalle* plurality, applying *Batson,* upheld the trial court and affirmed the conviction under the court's prevailing precedent. *Id.* At the same time, however, the *Saintcalle* plurality explored its approach to *Batson* to determine whether its approach was "robust

enough to effectively combat race discrimination in the selection of juries."
*Id.* at 329, 333–39.

The *Saintcalle* plurality noted that race discrimination in courtrooms raises a serious problem but that *Batson,* though designed to escape the crippling burden of proof in prior cases involving racial discrimination concerning juries, created its own crippling burden. *Id.* at 333–35. The *Saintcalle* plurality noted that the requirement of conscious discrimination was especially disconcerting because "it seemingly requires judges to accuse attorneys of deceit and racism in order to sustain a *Batson* challenge." *Id.* at 338.

The *Saintcalle* plurality further noted while *Batson* dealt with purposeful discrimination, discrimination today "is frequently unconscious" but not "any less pernicious." *Id.* at 336. The *Saintcalle* plurality noted that research showed that "people will act on unconscious bias far more often if reasons exist giving plausible deniability." *Id.* The *Saintcalle* plurality observed that "[a] strict 'purposeful discrimination' requirement thus blunts *Batson*'s effectiveness and blinds its analysis to unconscious racism." *Id.* at 338.

As a first step, the *Saintcalle* plurality stated that the purposeful discrimination requirement of *Batson* should be replaced with a requirement which "accounts for and alerts trial courts to the problem of unconscious bias." *Id.* at 339. The *Saintcalle* plurality suggested that

> it might make sense to require a *Batson* challenge to be sustained if there is a reasonable probability that race was a factor in the exercise of the peremptory or where the judge finds it is more likely than not that, but for the defendant's race, the peremptory would not have been exercised.

*Id.* In the alternative, however, the *Saintcalle* plurality recognized that it may be that the problem of racial discrimination in jury selection is so dire

that the only solution is elimination of peremptory challenges altogether. *Id.*

The *Saintcalle* plurality reasoned that allowing systematic removal of minority jurors will "create a badge of inferiority, cheapening the value of the jury verdict." *Id.* at 337. The *Saintcalle* plurality cited research that indicates that "compared to diverse juries, all-white juries tend to spend less time deliberating, make more errors, and consider fewer perspectives." *Id.*

A concurring opinion by Justice González provided an even more extended analysis of *Batson* than the *Saintcalle* plurality. *Id.* at 350–68 (González, J., concurring). Justice González began his analysis with a review of the voir dire process. *Id.* at 351. Justice González observed that "[w]ith limited information and time, and a lack of any reliable way to determine the subtle biases of each prospective juror, attorneys tend to rely heavily on stereotypes and generalizations in deciding how to exercise peremptory challenges." *Id.* at 353. Jurors are excused based on "rough and rapid" and "superficial judgments." *Id.* at 355.

After stressing the limitations of the voir dire process, Justice González explored the contours of racial bias in jury selection. *Id.* He reviewed studies from Washington State and other jurisdictions, coming to the conclusion that "racial discrimination in the use of peremptory challenges is widespread." *Id.* at 356–58.

Justice González asserted that for several reasons, "[c]ase-by-case adjudication and appellate review under *Batson* cannot effectively combat the widespread racial discrimination that underlies the use of peremptory challenges." *Id.* at 358. First, Justice González observed that the presence of racial discrimination remains entirely imperceptible to the opposing party and the trial judge. *Id.* Second, Justice González wrote that "even

if an objection is made, plausible race-neutral reasons are quite easy to conjure up in any given case." *Id.* at 359. Third, Justice González observed that there is usually no way for a trial court to accurately and reliably determine whether a given peremptory challenge is racially discriminatory, noting, among other things, that trial judges may be hesitant to question the integrity or self-awareness of counsel. *Id.* Fourth, Justice González declared "there is no way for appellate courts to provide sufficiently meaningful review" of trial court decisions where inconsistencies might be ambiguous and the record of the rapid voir dire may not have explored the comparative characteristics of other jurors. *Id.* at 360. Finally, Justice González stated that too many unanswered questions remain under *Batson*, including which groups are protected, how a prima facie case is established and reviewed on appeal, how dual motive cases should be considered, and how to deal with questions of unconscious bias. *Id.* at 360–61. Justice González concluded that application of *Batson* "will continue to engender confusion and needless administrative and litigation costs, while racial discrimination in the use of peremptory challenges—both conscious and unconscious—continues unabated." *Id.* at 361.

Justice González next made the case for elimination of peremptory challenges. *Id.* at 362. Justice González noted that peremptory challenges contribute to the underrepresentation of minority groups on juries even in the absence of purposeful discrimination, impose substantial administrative and litigation costs, result in juries that are less effective and less productive, and amplify the underlying resource disparity among litigants. *Id.* at 362–63.

On the other hand, Justice González asserted that the benefits of peremptory challenges were minimal. *Id.* at 363. Justice González

marshalled studies to support his view that peremptory challenges were generally ineffective in excluding unfavorable jurors and concluded that the notion that impartiality is furthered by allowing litigants to exercise arbitrary and unsupported juror challenges is a farce. *Id.* at 364–65.

Yet, on the facts presented, Justice González concluded that the defendant was not entitled to relief because the erroneous allowance of a peremptory challenge does not warrant reversal in every case. *Id.* at 369. Justice Chambers, however, came to a different conclusion. *Id.* at 371 (Chambers, J., dissenting).

According to Justice Chambers, *Batson* "was a great, symbolic step forward" but "was doomed from the beginning because it requires one elected person to find that another elected person (or one representing an elected person) acted with a discriminatory purpose." *Id.* Justice Chambers urged that the court, in the exercise of its supervisory power, "hold that a prima facie case of discrimination is established when the sole remaining venire member of a constitutional cognizable racial group is peremptorily challenged." *Id.*

The Washington Supreme Court returned to the *Batson* issue in *Erickson*, 398 P.3d at 1126. In this case, a black man was charged with unlawful use of a weapon and resisting arrest. *Id.* In voir dire, the prosecutor exercised a peremptory challenge against the only African-American on the jury panel. *Id.* Unlike in *Saintcalle*, the court was explicitly asked to alter the standard framework of the *Batson* analysis. *Id.* The Washington Supreme court proceeded to do so. *Id.*

The *Erickson* court adopted a "bright-line rule" and concluded that a peremptory strike of the only African-American on a jury panel gives rise to a prima facie case under *Batson*. *Id.* Because the passage of time prevented the district court from conducting a reasonable evaluation of

the underlying basis for the strike, the *Erickson* court concluded that a remand for a new trial was the appropriate remedy. *Id.* at 1131.

Justice Stephens concurred in the result, but emphasized that the Washington Supreme Court had a pending rulemaking to reconfigure *Batson* so that intentional discrimination must no longer be proved. *Id.* at 1133 (Stephens, J., concurring). Justice Stephens characterized the debate surrounding the proposed rule as "robust and informative." *Id.* He noted that the court in its decision had not "fixed the problem" and stressed that the court was "unanimous in its commitment to eradicate racial bias from our jury system, and that [the court would] work with all partners in the justice system to see this through." *Id.*

Finally, the Washington Supreme Court considered a *Batson*-type issue in *State v. Jefferson*, 429 P.3d 467, 470 (Wash. 2018). In *Jefferson*, the prosecution exercised a peremptory challenge to remove the last African-American from the jury pool. *Id.* The stated reasons were that the juror thought voir dire was "a waste of time", the juror had specific knowledge of the movie 12 Angry Men, and the juror in a prior trial had brought into jury deliberations outside discussions. *Id.* at 472.

The *Jefferson* court first concluded that, under *Batson*, there would be no violation. *Id.* The *Jefferson* court also concluded that Washington's new rule related to jury selection would not apply to the proceeding. *Id.* at 477. But the *Jefferson* court proceeded to apply a "new" *Batson* test to decide the issue. *Id.* at 480.

The *Jefferson* court departed from step three in *Batson*. *Id.* Under the new formulation, the *Jefferson* court stated the question on step three of the analysis "is whether 'an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge.'" *Id.* The test was not based on purposeful discrimination, but instead focused on

objective analysis. *Id.* The *Jefferson* court emphasized that review of this determination would be de novo. *Id.*

Applying the test de novo, the *Jefferson* court determined that the strike was invalid. *Id.* at 480–81. The *Jefferson* court carefully examined the record and determined that the information the juror brought into a prior trial was not germane to the issues at hand. *Id.* at 480.

Promulgated before the *Jefferson* case but only applying prospectively, jury selection in Washington is now subject to Washington General Rule 37. *See* Wash. Gen. R. 37 (2018). The new rule regulates peremptory challenges. *See id.* According to the new rule, "If the court determines that an objective observer could view race or ethnicity as a factor," then the peremptory strike is invalid. *Id.* R. 37(e). Further, the new rule emphasizes that "an objective observer is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in Washington State." *Id.* R. 37(f). The new rule provides a number of factors to be considered in making the objective determination, including the number and type of voir dire questions, a comparison of the number and nature of questions posed to other jurors, whether jurors with similar answers were stricken, whether the asserted reason asserted might be disproportionately associated with race or ethnicity, and whether the party disproportionately used peremptory challenges in the present case or in past cases. *Id.* R. 37(g). The new rule provides a list of reasons that are presumed to be invalid, including having prior contact with law enforcement, expressing distrust in law enforcement or a belief that law enforcement engages in racial profiling, having a close relationship with people who have been stopped for a crime, living in high crime neighborhoods, having children outside marriage, receiving state benefits,

and not being a native English speaker. *Id.* R. 37(h). Finally, the rule provides a list of conduct-oriented reasons that have "historically been associated with improper discrimination," including sleeping, failure to make eye contact, body language, and other demeanor-type evidence. *Id.* R. 37(i). The new rule further provides that if a party intends to rely on such conduct as a basis for the exercise of a peremptory challenge, notice has to be served on the other party. *Id.* Further, if the demeanor rationale is not corroborated by the judge or opposing party, that lack of corroboration could be a basis for invalidating the attempted strike. *Id.* The rule, as available at Washington Courts, *General Rule 37: Jury Selection*, https://www.courts.wa.gov/court_rules/?fa=court_rules.rulesPDF&ruleId=gagr37&pdf=1 (last visited May 21, 2019), is reproduced herein in Appendix A.

**C. Discussion.** It seems to me beyond clear that our system's approach to achieving a fair cross section of the community in the jury pool and in ensuring African-Americans receive a fair trial is in need of an overhaul. We have made a good first step in our revisions of the fair-cross-section jurisprudence. *See Lilly*, ___ N.W.2d at ___ (Appel, J., concurring specially). But it is critically important that the gains made today are not eliminated by a *Batson* framework that permits the elimination of African-American petit jurors through the back door of peremptory challenges.

It seems to me the experience of over thirty years demonstrates not that *Batson* is worthless, but rather that it is very ineffective. The reasons are well known.

First, just like in the fair-cross-section question, Iowa constitutional law must recognize that African-Americans and other minorities make up a relatively small proportion of the state's population. *See Plain*, 898 N.W.2d at 830 (noting that black people comprise a small percentage of

Iowa's population). Because of this salient fact, the absolute disparity approach to fair cross section required revision. Likewise, the relatively small proportion of minorities in Iowa means that it will be relatively easy for all minority jurors to be eliminated through the exercise of peremptory challenges. Leonard L. Cavise, *The* Batson *Doctrine: The Supreme Court's Utter Failure to Meet the Challenge of Discrimination in Jury Selection*, 1999 Wis. L. Rev. 501, 527 (noting that minorities in low population jurisdictions can be completely eliminated from jury pool through peremptory challenges). A toothless *Batson* review in Iowa courts could eliminate the fair-cross-section gains achieved in today's cases.

Second, the state's justification offered in *Batson*'s step two need not be persuasive and can even be frivolous or utterly nonsensical. *See, e.g.*, *Purkett*, 514 U.S. at 768–69, 115 S. Ct. at 1771 (majority opinion). It has been charitably described as an "extremely low" threshold. Alafair S. Burke, *Prosecutors and Peremptories*, 97 Iowa L. Rev. 1467, 1470 (2012). Any reasonably imaginative prosecutor can come up with a facially neutral justification. *See* Bellin & Semitsu, 96 Cornell L. Rev. at 1090–99 (providing list of cases upholding peremptory strikes for racially neutral but apparently insubstantial reasons).

Third, once the low threshold of articulating a facially neutral justification has been crossed, the burden shifts to the defendant to show pretext and what amounts to purposeful discrimination. Purposeful discrimination is very difficult to prove. If a prosecutor asserts vague but racially neutral demeanor observations of a potential juror such as lack of eye contract, tone of voice, or body language, how does a district court evaluate such claims? And even in very compelling cases like *Miller-El* and *Foster*, the fractured decisions of the United States Supreme Court on the factual issue of purposeful discrimination illustrate the problem.

Fourth, requiring a district court judge to, in effect, charge the local prosecutor with lying and racial motivation from the bench in the course of voir dire is unrealistic. *See Coombs v. Diguglielmo*, 616 F.3d 255, 264 (3d Cir. 2010) ("No judge wants to be in the position of suggesting that a fellow professional—whom the judge may have known for years—is exercising peremptory challenges based on forbidden racial considerations."); *Saintcalle*, 309 P.3d at 338 (plurality opinion) ("A requirement of conscious discrimination is especially disconcerting because it seemingly requires judges to accuse attorneys of deceit and racism in order to sustain a *Batson* challenge."); José Felipé Anderson, *Catch Me If You Can! Resolving the Ethical Tragedies in the Brave New World of Jury Selection*, 32 New Eng. L. Rev. 343, 374, 377 (1998) (noting that judges "have little incentive to use [the power granted by *Batson*] against lawyers who regularly practice before them.").

Fifth, the trial judge will not have a transcript from which to conduct the kind of meticulous but ultimately highly persuasive comparative analysis engaged in by Justice Souter in *Miller-El*, 545 U.S. at 240–51, 125 S. Ct. at 2325–31 (majority opinion). Although it is possible for an appellate court to later engage in the review, the reliance on the prospect of reversal many years after a tainted conviction is not very comforting.

Sixth, *Batson* does not purport to address at all the problem of implicit bias. Jean Montoya, *The Future of the Post-*Batson *Peremptory Challenge: Voir Dire by Questionnaire and the "Blind" Peremptory*, 29 U. Mich. J.L. Reform 981, 1024 (1996). But as noted by Justice O'Connor, "It is by now clear that conscious and unconscious racism can affect the way white jurors perceive minority defendants and the facts presented at their trials, perhaps determining the verdict of guilt or innocence." *Georgia*

*v. McCollum*, 505 U.S. 42, 68, 112 S. Ct. 2348, 2364 (1992) (O'Connor, J., dissenting).

Seventh, *Batson*'s relatively free reign on peremptory challenges cuts rough against the grain of the constitutional value of achieving juries with fair cross sections of the community. By opening the valve on peremptory challenges, you close the fair-cross-section pipe and lose the benefits of diversity, which are substantial. *See id.* at 61, 112 S. Ct. at 2360 (Thomas, J., concurring) ("[S]ecuring representation of the defendant's race on the jury may help to overcome racial bias and provide the defendant with a better chance of having a fair trial."); *Peters v. Kiff*, 407 U.S. 493, 503–04, 92 S. Ct. 2163, 2169 (1972) ("When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience . . . . [I[ts exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented."); *State v. LaMere*, 2 P.3d 204, 212 (Mont. 2000) ("[D]iversity begets impartiality."); Samuel R. Sommers, *On Racial Diversity and Group Decision Making: Identifying Multiple Effects of Racial Composition on Jury Deliberations*, 90 J. Personality & Soc. Psychology 597, 597 (2006) (explaining that racially diverse juries were more amenable to discussion of racism, discussed more trial evidence, and made fewer errors).

To some extent, the Supreme Court in *Miller-El* may have wished to inject some life into *Batson* by carefully canvassing the evidence and modelling how comparative analysis of juror questioning can be used to establish pretext. But in *Miller-El*, there were ten African-Americans in the jury panel. Thus, the voir dire of these ten African-Americans, along with voir dire of other jurors, provided a mountain of comparative evidence. Voir dire in Miller-El's trial comprises eleven volumes and 4662 pages.

*Miller-El*, 545 U.S. at 283, 125 S. Ct. at 2350 (Thomas, J., dissenting). In Iowa, however, there will likely never be a jury pool with ten African-Americans in the juror panel and an eleven volume voir dire transcript. Even with the proposed reforms embraced today, only a few African-Americans are likely to be in most Iowa jury pools. In these cases, there will be no body of comparative evidence similar to that developed by Justice Souter in *Miller-El*. In Iowa, *Miller-El* is likely a mirage.

It remains to be seen whether any *Batson* reform can be successful in Iowa. It is certainly true that without engaging in a robust review of a prosecutor's stated reasons for exclusion, *Batson* will likely be largely ineffective in eliminating racial discrimination in jury selection. *See* Anna Roberts, *Disparately Seeking Jurors: Disparate Impact and the (Mis)use of* Batson, 45 U.C. Davis L. Rev. 1359, 1388 (2012) (advocating "proactive, creative, and assertive" scrutiny of race-neutral justifications).

Given all the problems of *Batson*, it may well be that an adjustment here and there may not be enough. I certainly recognize the power of Justice Marshall's dissent in *Batson*, the views of experienced judges, and the large body of academic commentary that has followed, all of which suggest that the only solution is the elimination of peremptory challenges from our jury system. *See Morgan v. Commonwealth*, 189 S.W.3d 99, 115–16 (Ky. 2006) (Graves, J., concurring) (expressing the hope that the case put the state "one step closer to the inevitable implosion of the current peremptory challenge system"), *majority opinion overruled on other grounds by Shane v. Commonwealth*, 243 S.W.3d 336, 341 (Ky. 2007); *People v. Brown*, 769 N.E.2d 1266, 1272 (N.Y. 2002) (Kaye, C.J., concurring) ("My own years . . . dealing with countless *Batson* challenges, have brought me far closer to the perception of Justice Thurgood Marshall . . . ."); Tania

Tetlow, *Why* Batson *Misses the Point*, 97 Iowa L. Rev. 1713, 1735–1736 (2012) (asserting *Batson*'s problems cannot be solved by mere tinkering).

The elimination of peremptory challenges, of course, is a substantial proposition and no one has asked for it in this case. What Veal does ask for, however, is a revision of our approach when the last African-American is removed from the jury with a peremptory strike.

I agree. When the last African-American member of the jury is subject to a peremptory challenge, the interest in achieving a fair cross section of the community on the jury is at its highest point. I think we should be giving the elimination of the last minority juror through a peremptory challenge greater scrutiny than other *Batson* challenges ordinarily require. For last minority jurors, I think we should require at this stage that the prosecutor provide a specific challenge related to the facts of the case. That amounts to *Batson* with teeth on step two of the traditional analysis. Then, in step three, as under the Washington approach, the district court should objectively determine whether the asserted reason was in fact race neutral or whether race may have played a role in the strike. *See* Wash. Gen. R. 37(e); *Jefferson*, 429 P.3d at 480. If the district court objectively determines that the reason asserted for the strike is race neutral, the district court should then objectively weigh the prosecution's racially neutral interest in eliminating the juror against the defendant's interest in a jury composed of a fair cross section of the community. *See* Tania Tetlow, *Solving* Batson, 56 Wm. & Mary L. Rev. 1859, 1894–1900 (2015) (proposing a balancing of prosecution's neutral interest against defendant's fair-cross-section interest).

Applying this test, I would hold that the strike of the last African-American juror was invalid. Based on my review of the record, I would credit the prosecution's reason for the strike as race neutral based on

objective analysis of the facts. I would then proceed to the balancing test. While the prosecution may have had an interest in exclusion of the juror, the juror appeared to have very little contact with her father and little if any bitterness arising out of his past prosecution. More importantly, she was the last African-American member of the venire pool. On balance, I would conclude that Veal's interest in a fair cross section outweighed the prosecution's interest in disqualifying the juror. Because an error in jury selection persists through the entire course of proceeding, I would reverse Veal's conviction and remand for a new trial. *See Tankleff v. Senkowski,* 135 F.3d 235, 248 (2d Cir. 1998).

Wiggins, J., joins this concurrence in part and dissent in part.

APPENDIX A

# GR 37

# JURY SELECTION

(a) Policy and Purpose. The purpose of this rule is to eliminate the unfair exclusion of potential jurors based on race or ethnicity.

(b) Scope. This rule applies in all jury trials.

(c) Objection. A party may object to the use of a peremptory challenge to raise the issue of improper bias. The court may also raise this objection on its own. The objection shall be made by simple citation to this rule, and any further discussion shall be conducted outside the presence of the panel. The objection must be made before the potential juror is excused, unless new information is discovered.

(d) Response. Upon objection to the exercise of a peremptory challenge pursuant to this rule, the party exercising the peremptory challenge shall articulate the reasons the peremptory challenge has been exercised.

(e) Determination. The court shall then evaluate the reasons given to justify the peremptory challenge in light of the totality of circumstances. If the court determines that an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge, then the peremptory challenge shall be denied. The court need not find purposeful discrimination to deny the peremptory challenge. The court should explain its ruling on the record.

(f) Nature of Observer. For purposes of this rule, an objective observer is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in Washington State.

(g) Circumstances Considered. In making its determination, the circumstances the court should consider include, but are not limited to, the following:

(i) the number and types of questions posed to the prospective juror, which may include consideration of whether the party exercising the peremptory challenge failed to question the prospective juror about the alleged concern or the types of questions asked about it;

(ii) whether the party exercising the peremptory challenge asked significantly more questions or different questions of the potential juror against whom the peremptory challenge was used in contrast to other jurors;

(iii) whether other prospective jurors provided similar answers but were not the subject of a peremptory challenge by that party;

(iv) whether a reason might be disproportionately associated with a race or ethnicity; and

(v) whether the party has used peremptory challenges disproportionately against a given race or ethnicity, in the present case or in past cases.

(h) Reasons Presumptively Invalid. Because historically the following reasons for peremptory challenges have been associated with

improper discrimination in jury selection in Washington State, the following are presumptively invalid reasons for a peremptory challenge:

(i) having prior contact with law enforcement officers;

(ii) expressing a distrust of law enforcement or a belief that law enforcement officers engage in racial profiling;

(iii) having a close relationship with people who have been stopped, arrested, or convicted of a crime;

(iv) living in a high-crime neighborhood;

(v) having a child outside of marriage;

(vi) receiving state benefits; and

(vii) not being a native English speaker.

**(i)** Reliance on Conduct. The following reasons for peremptory challenges also have historically been associated with improper discrimination in jury selection in Washington State: allegations that the prospective juror was sleeping, inattentive, or staring or failing to make eye contact; exhibited a problematic attitude, body language, or demeanor; or provided unintelligent or confused answers. If any party intends to offer one of these reasons or a similar reason as the justification for a peremptory challenge, that party must provide reasonable notice to the court and the other parties so the behavior can be verified and addressed in a timely manner. A lack of corroboration by the judge or opposing counsel verifying the behavior shall invalidate the given reason for the peremptory challenge.

[Adopted effective April 24, 2018.]

**McDONALD, Justice (concurring in part, dissenting in part).**

I concur in the following divisions of Justice Mansfield's opinion: divisions V (speedy trial), VI (*Batson* challenge), VII (prosecutorial error), VIII (firearm demonstration), IX (competency hearing), X (excluded evidence), and XI (sufficiency of the evidence). I dissent from division IV (fair cross section) of the opinion. On that claim, I would affirm the ruling of the district court and affirm the conviction without remand. I thus respectfully concur in part and dissent in part.

## I.

On appeal, defendant Peter Veal asserts a fair-cross-section claim arising under article I, section 10 of the Iowa Constitution. To the extent Justice Mansfield's opinion could be interpreted to mean Veal can assert a state constitutional claim on remand, I respectfully disagree. Veal failed to present a state constitutional claim in the district court, and the claim is not preserved for appellate review. It is improper to remand this matter to allow Veal to assert a claim arising under the state constitution when he failed to first present the issue to the district court prior to trial or in his posttrial motion. *See State v. Coleman*, 890 N.W.2d 284, 286 (Iowa 2017) (stating where a defendant "only identifies [a federal] claim, the state constitutional claim has not been preserved at the district court"); *Van Gorden v. Schuller*, 192 Iowa 853, 859, 185 N.W. 604, 607 (1921) ("Neither is it within the scope of our appellate jurisdiction to remand this proceeding to the district court for the making and trial of new issues at law.").

## II.

Veal also asserts a federal claim arising under the Sixth and Fourteenth Amendments to the United States Constitution. As pertinent

here, the Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[] by an impartial jury of the State and district wherein the crime shall have been committed . . . ."

### A.

In *Taylor v. Louisiana*, the Supreme Court held, "[T]he selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." 419 U.S. 522, 528, 95 S. Ct. 692, 697 (1975).

This Sixth Amendment right is not grounded in text or history. *See Holland v. Illinois*, 493 U.S. 474, 480, 110 S. Ct. 803, 807 (1990) ("The fair-cross-section venire requirement is obviously not explicit in this text . . . ."); *see also Berghuis v. Smith*, 559 U.S. 314, 334, 130 S. Ct. 1382, 1396 (2010) (Thomas, J., concurring) ("[The right] seems difficult to square with the Sixth Amendment's text and history."); *Duren v. Missouri*, 439 U.S. 357, 371, 99 S. Ct. 664, 672 (1979) (Rehnquist, J., dissenting) ("The Constitution does not require, and our jurisprudence is ill served, by a hybrid doctrine such as that developed in *Taylor*, and in this case."); *Taylor*, 419 U.S. at 539, 95 S. Ct. at 702 (Rehnquist, J., dissenting) ("Relying on carefully chosen quotations, [the majority] concludes that the 'unmistakable import' of our cases is that the fair-cross-section requirement 'is an essential component of the Sixth Amendment right to a jury trial.' I disagree. Fairly read, the only 'unmistakable import' of those cases is that due process and equal protection prohibit jury-selection systems which are likely to result in biased or partial juries.").

Despite the lack of textual or historical support for a constitutional right to a jury venire composed of a fair cross section of the community, the Supreme Court continued to develop the right post-*Taylor*. In *Holland*,

the Supreme Court explained the right "is derived from the traditional understanding of how an 'impartial jury' is assembled." 493 U.S. at 480, 110 S. Ct. at 807. The Supreme Court explained the right does not entitle the accused to a representative jury, but only an impartial one:

> The Sixth Amendment requirement of a fair cross section on the venire is a means of assuring, not a *representative* jury (which the Constitution does not demand), but an *impartial* one (which it does). Without that requirement, the State could draw up jury lists in such manner as to produce a pool of prospective jurors disproportionately ill disposed towards one or all classes of defendants, and thus more likely to yield petit juries with similar disposition. The State would have, in effect, unlimited peremptory challenges to compose the pool in its favor. The fair-cross-section venire requirement assures, in other words, that in the process of selecting the petit jury the prosecution and defense will compete on an equal basis.

*Id.* at 480–81, 110 S. Ct. at 807; *see Duren*, 439 U.S. at 364 n.20, 99 S. Ct. at 668 n.20 (majority opinion) ("We further explained that this requirement does not mean 'that petit juries actually chosen must mirror the community.'" (quoting *Taylor*, 419 U.S. at 538, 95 S. Ct. at 702) (majority opinion)).

In *Duren*, the Supreme Court set forth the elements necessary to establish a prima facie violation of the right:

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

439 U.S. at 364, 99 S. Ct. at 668. With respect to the third element, the Supreme Court concluded systematic exclusion requires proof the underrepresentation is persistent and caused by some particular mechanism in the jury-selection process. *See id.* at 366, 99 S. Ct. at 669;

*Berghuis*, 559 U.S. at 328, 130 S. Ct. at 1392–93 (majority opinion) (explaining the defendant in *Duren* established a prima facie case when he showed with "particularity" the "underrepresentation was persistent" and caused by "two [particular] stages of the jury-selection process").

### B.

Veal failed to establish that the jury pool was not a fair and reasonable representation of the jury-eligible population. I disagree with the majority's decision to nonetheless remand this matter to allow Veal to try and marshal additional evidence in support of a claim he already lost.

First, as noted in my separate opinion in *State v. Lilly*, ___ N.W.2d ___, ___ (Iowa 2019) (McDonald, J., concurring in part and dissenting in part), there is no reliable county-level data regarding the number of eligible jurors. There is also no reliable county-level data regarding the race or ethnicity of eligible jurors. It was Veal's burden to establish a prima facie case, and the failure to present reliable evidence to support his claim defeats the claim.

Second, even assuming the data was reliable, the data shows this jury pool was actually overrepresentative. During the relevant time period, the population of Webster County was approximately 36,000. Of those, 4.6%, or 1656, were African-American, and 34,344 persons were not African-American. As I noted in *Lilly*, there is no reliable information regarding how many persons in the county were jury-eligible. Setting aside that particular criticism, using the majority's assumptions, the number of eligible African-Americans jurors was approximately 1100 while the number of jury-eligible others was 26,685. Approximately 700 white persons and 400 African-Americans were incarcerated at the Fort Dodge Correctional Facility located in Webster County. This is consistent with historical census information. *See* Rose Heyer & Peter Wagner, Prison

Policy Initiative, *Too Big to Ignore: How Counting People in Prisons Distorted Census 2000* (2004) [hereinafter Heyer & Wagner], https://www.prisonersofthecensus.org/toobig/datasearch.php?field=GEO_NAME&operator=LIKE&q=webster&Submit=Search&field1=&operator1=&q1=&sortby=&sortorder= [https://perma.cc/7DGC-CT3Y] (containing data set showing 26.47% of the African-American population in Webster County in 2000 was incarcerated).  The majority agrees that the census counts prisoners in its census data and that prisoners should be excluded from determining the jury-eligible population.  *See* Heyer & Wagner, https://www.prisonersofthecensus.org/toobig/exec_sum.html [https://perma.cc/CUJ4-SEF7] ("The Census Bureau counts people incarcerated in state and federal correctional facilities as if they were residents of the prison town.  Although incarcerated people are not a part of the prison town, they are a part of the community's statistics.").  If one removes incarcerated persons from the calculation (assuming all or almost all are 18 or older), there were 26,285 non-African-American eligible jurors and only 700 African-American eligible jurors, or 2.6% of all eligible jurors.  The majority concludes the percentage of African-Americans in the jury pool was 3.27%.  Thus, when adjusted for the unique demographics of this county, the jury pool here was actually overrepresentative of the African-American community.

In *Lilly*, the majority concluded that "[a] defendant whose jury pool has a percentage of the distinctive group at least as large as the percentage of that group in the jury-eligible population has not had his or her right to a fair cross section infringed." ___ N.W.2d at ___.  I agree. The defendant's fair-cross-section claim fails as a matter of law.  This court should affirm the defendant's conviction rather than remand.

C.

Remand is also improper because Veal failed to establish systematic exclusion within the meaning of *Duren.*

Veal's only allegation of systematic exclusion was that "these jury pools were only pulled from Driver's license/ID information and voter registration." This court has repeatedly rejected this challenge. *See State v. Huffaker,* 493 N.W.2d 832, 834 (Iowa 1992) (approving the use of voter registration list and motor vehicle operator's list); *State v. Jones,* 490 N.W.2d 787, 794 (Iowa 1992) (holding defendant failed to establish a violation of the fair-cross-section right where the jury manager used voter registration and motorist/identification lists), *overruled on other grounds by State v. Plain,* 898 N.W.2d 801, 822 (Iowa 2017); *State v. Johnson,* 476 N.W.2d 330, 333 n.1 (Iowa 1991) ("Although we do not reach the merits of defendant's contentions, we believe county officials should implement the directives of Iowa Code chapter 607A. Jury commissions and jury managers should use the source lists described in sections 607A.3(9) and 607A.22 to fulfill their statutory duties under sections 607A.1 and 607A.2 to provide for jury service a fair cross-section of the population of the area served by the court."). These cases are controlling, but the majority opinion does not address them. It is unclear to me why these long-standing, controlling precedents do not resolve Veal's claim.

In addition to the controlling authority, the persuasive authorities have approved the use of these lists. The Iowa Court of Appeals has repeatedly upheld the use of voter registration lists and driver's license/identification lists. *See State v. Washington,* No. 15–1829, 2016 WL 6270269, at *11 (Iowa Ct. App. Oct. 26, 2016) ("While we agree that the best practice would involve increasing the number of lists used in order to reach more of the population, Washington cannot establish that the use of the lists of registered voters and current motor vehicle operat[ors] is a

systematic exclusion."); *State v. Jackson,* No. 09–0462, 2010 WL 624906, at *7 (Iowa Ct. App. Feb. 24, 2010) (holding defendant failed "to prove a systematic exclusion, as the testimony of the Black Hawk County jury manager evidences that section 607A.22 was properly followed"); *State v. Salinas,* No. 05–0772, 2006 WL 1910207, at *4 (Iowa Ct. App. July 12, 2006) (holding the defendant failed to show systematic exclusion where jury manager used statutorily-required lists).

It appears that almost every federal circuit court has concluded that the use of voter registration lists to select a jury pool—less than what was done in this case—is constitutionally permissible. *See United States v. Willis,* 868 F.3d 549, 555 (7th Cir. 2017) ("In this case, the defendants cannot show that the underrepresentation of blacks in the jury pool was due to a systematic exclusion of this group. Rather, the jury venire was pulled from individuals registered to vote and this court has previously upheld this methodology . . . ."); *United States v. Garcia,* 674 F. App'x 585, 587 (8th Cir. 2016) ("[E]thnic and racial disparities between the general population and jury pools do not by themselves invalidate the use of voter registration lists and cannot establish the systematic exclusion of allegedly under-represented groups." (quoting *United States v. Greatwalker,* 356 F.3d 908, 911 (8th Cir. 2004))); *United States v. Hernandez-Estrada,* 749 F.3d 1154, 1166 (9th Cir. 2014) (en banc) ("Hernandez has not provided sufficient evidence 'linking sole reliance on voter registration lists for jury selection to current systematic exclusion of [distinctive groups] in the [Southern District].' " (alterations in original) (quoting *United States v. Rodriguez-Lara,* 421 F.3d 932, 945 (9th Cir. 2005), *overruled on other grounds by Hernandez-Estrada,* 749 F.3d at 1157)); *United States v. Watkins,* 691 F.3d 841, 850–51 (6th Cir. 2012) ("Specifically, he argues that the practice of summoning jurors using voter registration lists

exclusively, rather than also drawing from driver's-license and state-identification lists, disfavors minorities, who tend to vote in lower proportions than other groups.  But we specifically rejected this argument in [*United States v.*] *Odeneal*[, 517 F.3d 406 (6th Cir. 2008)]."); *United States v. Smith*, 247 F. App'x 321, 323 n.2 (3d Cir. 2007) ("We have affirmed the validity of jury selection procedures using voter registration and motor vehicle records as procedures 'constituted using facially neutral criteria [that] allow no opportunity for subjective or racially motivated judgments.'" (alteration in original) (quoting *Ramseur v. Beyer*, 983 F.2d 1215, 1233 (3d Cir. 1992))); *United States v. Orange*, 447 F.3d 792, 800 (10th Cir. 2006) ("The circuits are 'in complete agreement that neither the Act nor the Constitution require that a supplemental source of names be added to voter lists simply because an identifiable group votes in a proportion lower than the rest of the population.'" (quoting *United States v. Test*, 550 F.2d 577, 586 n.8 (10th Cir. 1976))); *United States v. Joost*, No. 95–2031, 1996 WL 480215, at *8 (1st Cir. Aug. 7, 1996) ("As for *Duren*'s third prong, the requirement that systematic exclusion be shown, we have already ruled out reliance *simpliciter* on voter registration lists."); *Schanbarger v. Macy*, 77 F.3d 1424, 1424 (2d Cir. 1996) (per curiam) ("[A] jury venire drawn from voter registration lists violates neither the Sixth Amendment's fair cross-section requirement nor the Fifth Amendment's guarantee of Equal Protection."); *United States v. Cecil*, 836 F.2d 1431, 1454 (4th Cir. 1988) ("We are reasonably confident that every jury plan in this Circuit, as well as those in most of the other Circuits, provides for the use of voter registration lists in the jury selection process . . . [which] have been approved, as satisfying the fair cross-section requirement of the statute and the Constitution.").

On this record, it is unclear to me why remand is necessary or proper. In *Plain*, we remanded the case to develop the record where the defendant "lacked the opportunity to do so because he was not provided access to the records to which he was entitled." 898 N.W.2d at 829. There is no such claim here.

Nothing in *Lilly* or the majority opinion in this case purports to change the showing required to establish "systematic exclusion" under the Sixth Amendment. Indeed, the majority agrees Veal's claim fails as a matter of law:

> Veal did not attempt to meet the third prong of *Duren/Plain* other than by arguing that systematic exclusion can be inferred from the 2016 aggregated data. As we explained in *Lilly*, that is not enough. The defendant must identify some practice or combination of practices that led to the underrepresentation, and it must be something other than the "laundry list" the Supreme Court declined to condemn in *Berghuis*."

(Citation omitted.)

I can find no authority to remand a case to allow the defendant an opportunity to relitigate a claim that everyone agrees he lost as a matter of law.

## III.

For these reasons, and for the reasons set forth in my separate opinion in *Lilly*, I concur in part and dissent in part.

Waterman and Christensen, JJ., join this concurrence in part and dissent in part.